Ade A. ADENIJI, Plaintiff,

v.

ADMINISTRATION FOR CHILDREN SERVICES, NYC, Defendant.

No. 97 Civ. 5827(KMW).

United States District Court
S.D. New York.

March 30, 1999.

408

Ade A. Adeniji, Bronx, NY, for plaintiff pro se.

Lesli Ligorner, Asst. Corp. Counsel, New York City, for defendant.

## ORDER

KIMBA M. WOOD, District Judge.

In a Report and Recommendation dated March 8, 1999 (the "Report") Magistrate Judge Peck recommended that I grant defendant's motion for summary judgment. *Pro se* plaintiff has submitted timely objections to the Report. Pursuant to 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b), the Court reviews *de novo* those aspects of the Report to which the parties object. For the reasons stated in this opinion, the Court adopts the Report in its entirety.

### I. *Background*

The facts of this case are explained in detail in the Report, familiarity with which is assumed. (*See* Report at 414–418.) The facts relevant to a discussion of plaintiff's objections can be summarized as follows. The Administration for Children Services, ("ACS") hired plaintiff as a caseworker on July 11, 1988. ACS received complaints from its clients and supervisors about plaintiff's interaction with clients between 1989 and 1993. (*See* ACS Rule 56.1 ¶ 8; Adeniji Rule 56.1 ¶ 8.)

From June 1994 until July 1995, plaintiff served as a homemaking liaison in ACS's Bronx filed office, a position that did not require client interaction. In July 1995,

plaintiff's supervisor, Ms. Mayra Juliano–Nunez ("Nunez"), reassigned plaintiff to another unit of the Bronx field office because he could not perform well around clients and because he was having frequent arguments with staff, superiors, and "overall getting out of hand in his behavior." (Ligorner Aff., Exh. C.) In October 1995, Nunez again reassigned plaintiff to a different unit where he was assigned homemaking duties; this move was in response to plaintiff's written grievance requesting that he be returned to his previous homemaking unit.

On November 29, 1995, during a caseworkers' conference that plaintiff attended, a caseworker in the Bronx field office, Mirta LaFontaine, said to plaintiff "you [are] not a king in Africa anymore, that you [are] subject to the rules of our office." (ACS Rule 56.1 Stmt. ¶ 14; Adeniji Rule 56.1 Stmt. ¶ 22.) Plaintiff claims that Nunez did not obtain an apology from Ms. LaFontaine and responded to him by saying that "Ms LaFontaine has a right to say what she said." (Adeniji Br. at 33; Adeniji Dep. at 138.) Plaintiff claims that Ms. LaFontaine's remark was the only racial remark anyone at ACS made to him.

On December 14, 1995, Nunez ordered plaintiff temporarily reassigned to a central home care unit in Manhattan for fifteen days. On December 15, 1995, Ms. Eileen Anderson ("Anderson"), Deputy Director of the Bronx field office, told Nunez that plaintiff was "discontent with the reassignment," and became "very upset and expressed his usual threats of calling every politician in the city if his demands were not met." (Ligorner Aff., Exh. C.) Plaintiff "made a series of threats, and appeared to have been at the verge of physically attacking Anderson as he presented body language that was very threatening." (Id.)

On December 28, 1995, the Executive Director of the ACS Office of Personnel Services requested that plaintiff be terminated, citing "the many instances of disruptive, insubordinate, verbally abusive and intimidating behavior," and stating that "the problems with Mr. Adeniji have been going on for sometime and have become increasingly intolerable." (Ligorner Aff., Exh. G.) The Executive Director stated that "aside from Mr. Adeniji's overt outbursts and inappropriate behavior, he is a definite threat to our clients and the children whom we are entrusted to protect." (Id.)

On February 1, 1996 plaintiff was reassigned to another homemaking unit. On March 18, 1996, Mr. James Stewart, a supervisor in plaintiff's homemaking unit, reported to Deputy Director Anderson that plaintiff had displayed "unprofessional behavior and disgruntled attitude" since he was reassigned. (See Ligorner Aff., Exh. C.) Mr. Stewart reported that plaintiff "rushed into my office extremely irate, frantically waving a [request for leave slip] demanding of me to sign it," and threatening "that if I did not approve his two day request he would not be responsible if he was to come to the office with a gun and shoot it up." (Id.) By March 18, 1996, plaintiff had received approximately eighteen written reprimands from supervisors and co-workers for unprofessional behavior. (See Ligorner Aff., Exh. C.)

On March 21, 1996, Anderson served plaintiff with a Notice and Statement of Charges, charging him with: 1. "displaying violent and inappropriate and threatening physical behavior toward" Anderson on December 15, 1995; 2. "shouting and cursing" in front of Nunez; 3. "ranting and threatening Nunez when she directed [plaintiff] to help the O.C.M. office with forms," in September 1995, and acting "insubordinate" and "unprofessional;" and 4. becoming "violent and ... throwing things around and kicking the desk and chairs" on July 11, 1995." (See Ligorner Aff., Exh. J.)

On April 2, 1996, plaintiff filed a discrimination complaint with the New York City Human Resources Administration Office of Equal Employment Opportunity ("HRA

EEO"). The next day, he filed a charge with the EEOC alleging discrimination based upon race, national origin, sex and retaliation. The HRA EEO found that there was insufficient evidence to substantiate plaintiff's allegations. (*See* Ligorner Aff., Exh. P: 6/10/96 HRA EEO Letter.)

During the period beginning April 10, 1996 through January 21, 1997, there were three formal hearings, and one informal conference, held before Office of Labor Relations hearing officers concerning plaintiff's disciplinary charges. (*See* Report at 417.) On January 21, 1997, a hearing officer affirmed the finding of the previous hearing officers that plaintiff was guilty of the disciplinary charges. The hearing officer recommended that plaintiff be terminated immediately. ACS terminated plaintiff on March 6, 1997.

Plaintiff brings this action pursuant to Title VII, 42 U.S.C. § 2000e et seq., as a result of his termination by ACS. Plaintiff asserts claims of race, national origin, and religious discrimination, retaliation, and sexual harassment against defendant. Defendant has moved for summary judgment.

## II. *Analysis*

■ Plaintiff objects to the Magistrate Judge's finding that the remark made to him by Ms. LaFontaine does not amount to race and national origin discrimination. Plaintiff claims that the racial slur was so "pregnant with meaning" and racist undercurrent that the Magistrate Judge should have found his work environment to be hostile on the basis of this one comment.

■ As Magistrate Judge Peck correctly points out, it is well-settled that one racial remark, or even sporadic remarks, are not sufficient to establish a hostile work environment. *See Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir.1997) ("For racist comments, slurs, and jokes to constitute a hostile work environment, there must 'be more than a few isolated incidents of racial enmity,' ... there must be a steady barrage of opprobrious racial comments.") (*See* Report at 421–423.)

Therefore, even assuming arguendo that the comment at issue was racist, the Court finds that this comment alone is not sufficient for plaintiff to establish a hostile work environment claim. The court therefore agrees with Magistrate Judge Peck that plaintiff has failed to make the requisite showing of hostile work environment and that defendant is therefore entitled to summary judgment on this claim.

■ Plaintiff also objects to the Magistrate Judge's finding that ACS fired plaintiff for legitimate, non-discriminatory reasons. In particular, plaintiff objects to Magistrate Judge Peck's finding that "ACS suspended and then fired Adeniji only after many supervisors wrote him up at least nineteen times for improper, aggressive, and threatening behavior, unprofessionalism, and uncompleted assignments." (*See* Report at 435.) Plaintiff's objections state that his supervisors reprimanded him in writing only six to ten times. Plaintiff asserts that the Magistrate Judge exaggerated plaintiff's disciplinary problems in order to justify the recommendation that summary judgment be granted in favor of defendant.

After having reviewed the record, the Court finds that there is ample evidence that ACS fired plaintiff for legitimate, non-discriminatory reasons. The Court also finds that the record substantiates Magistrate Judge Peck's finding that plaintiff had been reprimanded at least nineteen times for improper, aggressive, and threatening behavior and for uncompleted assignments. (*See* Adeniji Aff., Exh. J; Ligorner Aff., Exh. C; ACS Rule 56.1 Stmt. ¶ 9.) Furthermore, the Court finds that even if it were the case that plaintiff's supervisors had reprimanded him only six to ten times, this fact alone would support the Magistrate Judge's conclusion that there was ample evidence that defendant fired plaintiff for nondiscriminatory reasons. *See, e.g., Hutcherson v. City of New York*, 1998 WL 661490 at *3 (S.D.N.Y. Sept.25, 1998) (defendant's evidence that supervisor received "numerous complaints

from other employees regarding plaintiff's workplace demeanor" states a legitimate, nondiscriminatory reason for bringing plaintiff up on disciplinary charges). Accordingly, the Court adopts the reasoning and findings of the Magistrate Judge.

The Court has also considered plaintiff's other objection, that the Magistrate Judge misinterpreted and misapplied the relevant case law, and finds that it too is without merit. Having considered all of plaintiff's objections, the Court finds that they have no merit and therefore does not credit any of them. For the reasons stated in this opinion, and in the Report, the Court grants defendant's motion for summary judgment.[1]

### III. *Conclusion*

For the reasons stated in Magistrate Judge Peck's Report, and in this opinion, the Court hereby grants defendant's motion for summary judgment [28–1]. The Court denies plaintiff's motions for summary judgment [26–1] and to move the case to trial [26–2]. The Clerk of Court is directed to close this case. All pending motions are moot.

SO ORDERED.

### REPORT AND RECOMMENDATION

PECK, United States Magistrate Judge.

To the Honorable Kimba M. Wood, United States District Judge.

Pro se plaintiff Ade Adeniji, a Black, Muslim male from Nigeria, has asserted claims of race, national origin and religious discrimination, retaliation and sexual harassment against the Administration for Children Services ("ACS") pursuant to Title VII, 42 U.S.C. § 2000e et seq., as a

result of his termination by ACS. ACS has moved for summary judgment.

For the reasons set forth below, the Court recommends that ACS's motion for summary judgment be granted, since (1) one racially biased comment is insufficient to create a hostile work environment; (2) Adeniji failed to show he was treated differently than persons outside the protected race and national origin classes; (3) Adeniji did not assert his religious discrimination claim before the EEOC; (4) Adeniji did not demonstrate that he was terminated as a pretext for retaliation; and (5) Adeniji did not show that he was subject to sexual harassment.

### *FACTS*

The following facts are undisputed unless otherwise stated:[1]

ACS hired Adeniji as a caseworker on July 11, 1988. (ACS Rule 56.1 Stmt. ¶ 5; Adeniji Rule 56.1 Stmt. ¶ 2.)

ACS received complaints from ACS clients, supervisors and other professionals about Adeniji's interaction with clients between 1989 and 1993. (ACS Rule 56.1 Stmt. ¶ 8; Ligorner Aff.Ex. B; Adeniji Rule 56.1 Stmt. ¶ 8; *see also* Ligorner Aff.Ex. C.)

From June 1994 to July 14, 1995, Adeniji served as a homemaking liaison in ACS's Bronx field office, a position which did not require client interaction. (ACS Rule 56.1 Stmt. ¶ 10; Ligorner Aff.Ex. A: Adeniji Dep. at 131, 133.) On July 14, 1995, Adeniji told the Bronx Borough Director, Mayra Juliao–Nunez, that he was working out of title and that he was not being sufficiently compensated for his work. (ACS Rule 56.1 Stmt. ¶ 11; Adeniji Rule 56.1 Stmt. ¶ 19; *see also* Ligorner Aff.Ex. C:

---

1. In light of the Court's decision to grant defendant's motion for summary judgment, plaintiff's motions for an order "to move the case to trial" and "for an order granting summary judgment denied" are denied.

1. ACS argues that all of the facts in its Rule 56.1 Statement be deemed admitted, because

Adeniji failed to comply with Local Rule 56.1 (ACS Reply Br. at 3–5.) While Adeniji's Rule 56.1 Statement is less than exemplary, it does not flagrantly violate Rule 56.1, and it is well established that a pro se's papers are to be read liberally. The Court therefore rejects ACS's request.

7/14/95 Nunez Memo.) As a result, Ms. Nunez reassigned Adeniji to the MILS unit of the Bronx field office. (ACS Rule 56.1 Stmt. ¶ 12; Ligorner Aff.Ex. A: Adeniji Dep. at 146; Adeniji Rule 56.1 Stmt. ¶¶ 19–20; Ligorner Aff.Ex. C: 7/14/95 Nunez Memo.) Nunez reported to the Office of Labor Relations that she reassigned Adeniji because:

> he could not perform well around clients, work well with the staff, and ... he had even been banned from court activities. His behavior was also becoming more disturbed. He was having frequent arguments with staff, superiors and overall getting out of hand in his behavior. As a liaison for homemaking he was not helpful to the people he was supposed to help. He became verbally abusive, disruptive and defiant. Moreover, he claimed in a very adamant way, that he was working "out of title" anyway, and that he should be in a caseworker position and not in a Sup I position. This claim was the trigger in the conversation that confirmed the need for the decision to remove him to his current assignment as a caseworker in the MILS unit.

(Ligorner Aff.Ex. C: 9/22/95 Nunez Memo.)

On August 11, 1995, Adeniji filed a grievance requesting that he be returned to unit 316, the homemaking unit. (ACS Rule 56.1 Stmt. ¶ 11; Ligorner Aff.Ex. A: Adeniji Dep. at 148; Adeniji Rule 56.1 Stmt. ¶¶ 21, 29.) In October 1995, Nunez reassigned Adeniji to unit 376, a Protective Development ("PD") unit, where he was assigned homemaking duties. (ACS Rule 56.1 Stmt. ¶ 12; Ligorner Aff.Ex. A: Adeniji Dep. at 159–160; Adeniji Rule 56.1 Stmt. ¶ 21.) According to Adeniji, Unit 376 consisted of one African supervisor, one African–American supervisor, and four African caseworkers. (Ligorner Aff.Ex. A: Adeniji Dep. at 159.)

On November 29, 1995, during a caseworkers' conference at which Adeniji was present, a caseworker in the Bronx Field Office, Mirta LaFontaine, said to Adeniji "you [are] not a king in Africa anymore, that you [are] subject to the rules of our office." (ACS Rule 56.1 Stmt. ¶ 14; Adeniji Rule 56.1 Stmt. ¶ 22; Ligorner Aff.Ex. D & Adeniji Aff.Ex. B: LaFontaine Dep. at 14–15; Ligorner Aff.Ex. A: Adeniji Dep. at 182.) Adeniji complained to Nunez about LaFontaine's remark. (Ligorner Aff.Ex. A: Adeniji Dep. at 138.) Adeniji claims that Nunez responded by saying "Ms. LaFontaine has a right to say what she said." (Adeniji Br. at 33; Ligorner Aff.Ex. A: Adeniji Dep. at 138.) LaFontaine's remark was the only racial remark anyone at ACS made to Adeniji. (Ligorner Aff.Ex. A: Adeniji Dep. at 307, 354.)

On December 14, 1995, Nunez ordered Adeniji temporarily reassigned to a central home care unit in Manhattan for fifteen days. (ACS Rule 56.1 Stmt. ¶ 15; Adeniji Rule 56.1 Stmt. ¶ 23.) Nunez stated that she reassigned Adeniji because it "was an assignment that was compatible to what he was doing and we needed a break and he needed a break to sort out what was happening in his behavior," in other words, ACS "needed to get him out of the Bronx field office ... because of his behavior" problems. (Ligorner Aff.Ex. F: Nunez Dep. at 80–82, 84.) Article VII, Section (2)(c)(v)(7) of the 1992–1995 Social Services Agreement states that:

> [ACS] shall have the right to transfer an employee on an emergency basis for not more than fifteen (15) working days.... Where feasible, [ACS] will not assign an employee on an emergency basis more than one every six (6) months. The need for an emergency transfer shall be declared by the agency head or his/her designee.

(Ligorner Aff.Ex. E: 1992–1995 Soc. Serv. Agreement art. VII; *see* ACS Rule 56.1 Stmt. ¶ 16.) Adeniji asserts that he was "maliciously retaliatory [sic] and punitively reassigned to the Home Care Unit without any advanced notification nor did it appear to be an emergency." (Adeniji Rule 56.1 Stmt. ¶ 23.)

On December 15, 1995, Eileen Anderson, Deputy Director of the Bronx field office, told Nunez that Adeniji was "discontent with the [re]assignment," and became "very upset and express[ed] his usual threats of calling every politician in the city if his demands were not met." (Ligorner Aff.Ex. C: 12/18/95 Nunez Memo.) Adeniji "made a series of threats, and appeared to have been at the verge of physically attacking [Anderson] as he presented body language that was very threatening. Ms. Anderson expressed that she was very scared as Mr. Adeniji's behavior was very closed of [sic] being violent." (*Id.*)

On December 28, 1995, the Executive Director of the ACS Office of Personnel Services requested that Adeniji be terminated, citing "[t]he many instances of disruptive, insubordinate, verbally abusive and intimidating behavior," and stating that "the problems with Mr. Adeniji have been going on for sometime and have become increasingly intolerable." (Ligorner Aff.Ex. G: 12/28/95 Rosalind Clarke Memo; *see* ACS Rule 56.1 Stmt. ¶ 18.) Clarke stated that "[a]side from Mr. Adeniji's overt outbursts and inappropriate behavior, he is a definite threat to our clients and the children whom we are entrusted to protect. He is a danger to the Agency and continues to undermine its programs." (Ligorner Aff.Ex. G.) ACS, however, took no action at that time.

On February 1, 1996, Adeniji was reassigned from unit 376 to unit 316, a homemaking unit. (ACS Rule 56.1 Stmt. ¶ 19; Adeniji Aff.Ex. J: 2/1/96 Stewart Memo.) Adeniji was pleased with the reassignment. (*See* Adeniji Aff.Ex. J: 2/11/96 Stewart Memo, acknowledging Adeniji's "expressed gratitude and satisfaction regarding [his] reassignment to Homemaking unit '316'.")

On March 18, 1996, James Stewart, a unit 316 supervisor, reported to Deputy Director Anderson that Adeniji had displayed "unprofessional behavior and disgruntled attitude" since he was reassigned to unit 316. (Ligorner Aff.Ex. C: 3/18/96 Stewart Memo at 1.) Stewart reported that Adeniji "rushed into my office extremely irate, frantically waving a [request for leave slip] demanding of me to sign it," and threatening " 'that if I did not approve his two (2) day request he would not be responsible if he was to come to the office with a gun and shoot it up.' " (*Id.; see also* ACS Rule 56.1 Stmt. ¶ 22.) By March 18, 1996, Adeniji had been written up by supervisors and co-workers for unprofessional behavior at least eighteen times. (*See* Ligorner Aff.Ex. C.)

On March 21, 1996, Anderson served Adeniji with a Notice and Statement of Charges, charging him with: (1) "display[ing] violent and inappropriate and threatening physical behavior toward" Anderson on December 15, 1995; (2) "shouting and cursing" in front of Mayra Juliao–Nunez; (3) "rant[ing] and threaten[ing]" Nunez when she "directed [Adeniji] to help the O.C.M. office with forms," in September 1995, and acting "insubordinate" and "unprofessional"; and (4) becoming "violent and ... throwing things around and kicking the desk and chairs" on July 11, 1995. (Ligorner Aff.Ex. J; Adeniji Aff.Ex. I; *see also* ACS Rule 56.1 Stmt. ¶ 23; Adeniji Rule 56.1 Stmt. ¶ 30.)

On April 2, 1996, Adeniji filed a discrimination complaint with the New York City Human Resources Administration Office of Equal Employment Opportunity ("HRA EEO"). (ACS Rule 56.1 Stmt. ¶ 24; Adeniji Rule 56.1 Stmt. ¶ 32; Ligorner Aff.Ex. L; Adeniji Aff.Ex. K.) The next day, he filed a charge with the EEOC alleging discrimination based upon race, national origin, sex and retaliation. (ACS Rule 56.1 Stmt. ¶ 25; Ligorner Aff.Ex. M; Adeniji Rule 56.1 Stmt. ¶ 32.) The HRA EEO found "insufficient evidence to substantiate [Adeniji's] allegations." (Ligorner Aff.Ex. P: 6/10/96 HRA EEO Letter; *see* ACS Rule 56.1 Stmt. ¶ 28.)

On April 10, 1996, an informal conference was held concerning ACS's March 21, 1996 disciplinary charges against Adeniji.

(ACS Rule 56.1 Stmt. ¶ 26; Ligorner Aff. Ex. N.) The hearing officer found Adeniji committed the specified charges and recommended that he be terminated. (ACS Rule 56.1 Stmt. ¶ 26; Ligorner Aff.Ex. N.) Adeniji did not accept the penalty and appealed. (ACS Rule 56.1 Stmt. ¶ 27; Ligorner Aff.Ex. O.) The Office of Labor Relations found Adeniji guilty of the charges, but reduced the penalty of termination to a thirty-day suspension. (ACS Rule 56.1 Stmt. ¶ 30; Ligorner Aff.Ex. Q.) On November 18, 1996, ACS suspended Adeniji for 30 days without pay. (ACS Rule 56.1 Stmt. ¶ 31; Ligorner Aff.Ex. R; Adeniji Rule 56.1 Stmt. ¶ 40.)

On November 6, 1996, Adeniji was served with a second disciplinary charge. (Adeniji Rule 56.1 Stmt. ¶ 37; Adeniji Aff. Ex. I.) That charge alleged: (1) Adeniji threatened to " 'come to the office with a gun and shoot it up' " if Supervisor James Stewart did not sign his request for leave on February 13, 1996; (2) Adeniji "interrupted a managerial meeting with an angry and menacing posture, [he] verbally attacked fellow employees" on March 8, 1996; and (3) Adeniji refused to carry out work assignments. (Adeniji Aff.Ex. I.)

A hearing was held before the Office of Labor Relations on November 18, 1996; the Hearing Officer found Adeniji guilty of the charges alleged in the November 1996 specification and recommended that Adeniji be terminated. (ACS Rule 56.1 Stmt. ¶ 34; Ligorner Aff.Ex. U.) Adeniji appealed the recommendation, and was suspended with pay on December 19, 1996 while the review was pending. (ACS Rule 56.1 Stmt. ¶¶ 35, 36; Ligorner Aff.Exs. V & W.) The third and last hearing was held on January 21, 1997. The hearing officer affirmed the first hearing officer's findings and recommended that Adeniji be terminated immediately. (ACS Rule 56.1 Stmt. ¶ 37; Ligorner Aff.Ex. X.) ACS terminated Adeniji on March 6, 1997. (ACS Rule 56.1 Stmt. ¶ 39; Ligorner Aff.Ex. Y.)

*Facts Relevant to Adeniji's Sexual Harassment Claim*

From July 1995 through November 1995, Ms. Anderson was the child protective manager in the Bronx Field Office. (Adeniji Aff.Ex. G: Anderson Dep. at 18–19; ACS Rule 56.1 Stmt. ¶ 20.) In November 1995 she was promoted to Deputy Director (Adeniji Aff.Ex. G: Anderson Dep. at 18–19; ACS Rule 56.1 Stmt. ¶ 20.) It is uncontroverted that Anderson was never Adeniji's direct supervisor. (Adeniji Rule 56.1 Stmt. ¶ 31; Ligorner Aff.Ex. A: Adeniji Dep. at 243.) Adeniji, however, claims that she made "special efforts to circumvent the hierarchical structure to assign [him] cases and signed [his leave of absence forms] on several occasions." (Adeniji Rule 56.1 Stmt. ¶ 31.)

Adeniji claims that he and Anderson had a personal relationship from July 1995 to December 1995. (*See* Adeniji Rule 56.1 Stmt. ¶¶ 27(4), 28; Ligorner Aff.Ex. A: Adeniji Dep. at 240–41.) Sometime that December, Anderson sent Adeniji a Seasons Greetings Card addressed to "Ade & Family" and signed it "Love! Eileen & Son Hoping that the New Year will be a blessed one." (Adeniji Aff.Ex. J.)[2] On December 4, 1995 Adeniji decided that he did not feel the same way about Anderson, though he did not tell Anderson that he had a change of heart. (*See* Ligorner Aff.Ex. A: Adeniji Dep. at 265–66, 310–13.)

After Adeniji had a change of heart, he claims that he and Anderson remained "very close friend[s] ... professionally and personally" through March 1996, when their relationship ended because she served disciplinary charges on him. (Adeniji Rule 56.1 Stmt. ¶ 28; Ligorner Aff.Ex. A: Adeniji Dep. at 170–71, 244, 314.) Indeed, in February 1996, Adeniji sent Anderson a Valentines card and signed it "love". (Ligorner Aff.Ex. A: Adeniji Dep. at 310–11.) Adeniji also stated that

---

**2.** Anderson explained that she always sent such cards, signed "love," to all her subordinates, until she "learned [her] lesson" because of Adeniji's claims in this suit. (Adeniji Aff.Ex. G: Anderson Dep. at 108–09.)

Anderson asked him out on a date six times between July 1995 and March 1996; it is unclear, however, whether those requests took place before December 4, 1995. (Ligorner Aff.Ex. A: Adeniji Dep. at 211–12, 261, 265.) According to Adeniji, they went out on only one date, to McDonald's, on November 20, 1995. (*E.g.*, Adeniji Br. at 14.) Adeniji and Anderson never hugged, kissed or had any other physical contact. (Ligorner Aff.Ex. A: Adeniji Dep. at 233.) Adeniji stated that he never turned down Anderson's advances, but rather was diplomatically non-responsive. (Ligorner Aff.Ex. A: Adeniji Dep. at 241; Adeniji Br. at 14.) He also testified that the only "sexual" comment Anderson ever made to him was: " 'You little thing. Why women run you all over.' " (Adeniji Aff.Ex. H: Adeniji Dep. at 285–86.)

Adeniji claims that Anderson took adverse actions against him behind his back. (*E.g.*, Ligorner Aff.Ex. A: Adeniji Dep. at 241.) He alleges that she did so by telling him, in front of Nunez, " 'you know you are [a] very difficult person to get along with.' " (*Id.*) He also claims that Anderson was behind Nunez's decision to transfer him for fifteen days in December 1995. (*Id.* at 249.)

Anderson, on the other hand, denies that she and Adeniji had a personal relationship, that they ever went out, and that she had any involvement in his transfers. (Adeniji Aff.Ex. G: Anderson Dep. at 7–8, 13, 106, 108.)

## *ANALYSIS*

### I. *LEGAL PRINCIPLES GOVERNING EMPLOYMENT DISCRIMINATION ACTIONS*[3]

Title VII makes it unlawful "for an employer ... to fail or refuse to hire or to discharge any individual ... because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973), the Supreme Court established an allocation of the burden of production and an order for the presentation of proof in Title VII cases. *See, e.g., Fisher v. Vassar College*, 114 F.3d 1332, 1335 (2d Cir.1997) (en banc), *cert. denied,* —— U.S. ——, 118 S.Ct. 851, 139 L.Ed.2d 752 (1998). At the outset, the plaintiff has the burden of "proving by the preponderance of the evidence a prima facie case of discrimination." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981); *see also, e.g., O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 310, 116 S.Ct. 1307, 1309, 134 L.Ed.2d 433 (1996); *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507, 113 S.Ct. 2742, 2746–47, 125 L.Ed.2d 407 (1993); *McDonnell Douglas v. Green*, 411 U.S. at 802, 93 S.Ct. at 1824; *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir.1994); *Lediju v. New York City Dep't of Sanitation*, 173 F.R.D. 105, 113–14 (S.D.N.Y. 1997) (Leisure, D.J. & Peck, M.J.); *Hernandez v. New York City Law Dep't*, 94 Civ. 9042, 1997 WL 27047 at *12 (S.D.N.Y. Jan. 23, 1997) (Peck, M.J.); *Burger v. Litton*, 91 Civ. 0918, 1996 WL 421449 at *8 (S.D.N.Y. April 25, 1996) (Peck, M.J.), *report & rec. adopted by* 1996 WL 609421 (S.D.N.Y. Oct.22, 1996); *Pearson v. Metro–North Commuter R.R.*, 87 Civ. 6389, 1990 WL 20173 at *2 (S.D.N.Y. March 8, 1990) (Wood, D.J.).

■ In order to establish a prima facie case of discrimination in violation of Title

---

**3.** For discussion of the summary judgment standards applicable to employment discrimination actions, *see, e.g., Gallagher v. Delaney*, 139 F.3d 338, 347 (2d Cir.1998) (Weinstein, D.J.); *Morris v. Amalgamated Lithographers*, 994 F.Supp. 161, 167–68 (S.D.N.Y.1998) (Kaplan, D.J. & Peck, M.J.); *Hernandez v. New York City Law Dep't Corp. Counsel*, 94 Civ. 9042, 1997 WL 27047 at *6–7 (S.D.N.Y.

Jan. 23, 1997) (Peck, M.J.); *Burger v. Litton Indus., Inc.*, 91 Civ. 0918, 1996 WL 421449 at *7 (S.D.N.Y. April 25, 1996) (Peck, M.J.), *report & rec. adopted by* 1996 WL 609421 (S.D.N.Y. Oct. 22, 1996); *Scaria v. Rubin*, 94 Civ. 3333, 1996 WL 389250 at *4–5 (S.D.N.Y. July 11, 1996) (Peck, M.J.), *aff'd*, 117 F.3d 652 (2d Cir.1997).

VII, a plaintiff who asserts that he has been wrongfully terminated must show that: (1) he is a member of a protected class; (2) he satisfactorily performed the duties of his position; (3) he was subject to an adverse employment action; and (4) the adverse employment action occurred in circumstances giving rise to an inference of discrimination on the basis of his membership in that class. *See, e.g., Stern v. Trustees of Columbia Univ.*, 131 F.3d 305, 311–12 (2d Cir.1997); *Scaria v. Rubin*, 117 F.3d 652, 653–54 (2d Cir.1997); *Fisher v. Vassar College*, 114 F.3d at 1335; *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d at 37; *Hargett v. National Westminster Bank, USA*, 78 F.3d 836, 838 (2d Cir.), *cert. denied*, 519 U.S. 824, 117 S.Ct. 84, 136 L.Ed.2d 41 (1996); *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 464 (2d Cir.1989); *Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1188 (2d Cir.1987); *Ortega v. New York City Off–Track Betting Corp.*, 97 Civ. 7582, 1998 WL 355416 at *5 (S.D.N.Y. July 1, 1998) (Wood, D.J.); *Evans v. Golub Corp.*, 96 Civ. 3889, 1997 WL 681348 at *2 (S.D.N.Y. Nov. 3, 1997); *Jones v. General Bd. of Global Ministries*, 96 Civ. 5462, 1997 WL 458790 at *1 (S.D.N.Y. Aug. 11, 1997); *Burger v. Litton*, 1996 WL 421449 at *8; *Walker v. Triborough Bridge & Tunnel Auth.*, 89 Civ. 0371, 1990 WL 52139 at *3 (S.D.N.Y. April 17, 1990) (Wood, D.J.); *Pearson v. Metro–North Commuter R.R.*, 1990 WL 20173 at *3.

" 'The burden of establishing a prima facie case … is not onerous.' " *Fisher v. Vassar College*, 114 F.3d at 1335 (quoting *Texas v. Burdine*, 450 U.S. at 253, 101 S.Ct. at 1094); *see also, e.g., St. Mary's v. Hicks*, 509 U.S. 502, 506, 113 S.Ct. 2742, 2746–47, 125 L.Ed.2d 407; *Scaria v. Rubin*, 117 F.3d at 654; *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d at 37; *Ortega v. New York City Off–Track Betting Corp.*, 1998 WL 355416 at *5. Establishment of a prima facie case " 'in effect creates a presumption that the employer unlawfully discriminated against the employee.' " *Fisher v. Vassar College*, 114

F.3d at 1335 (quoting *Texas v. Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094); *see also, e.g., St. Mary's v. Hicks*, 509 U.S. at 506, 113 S.Ct. at 2747; *Scaria v. Rubin*, 117 F.3d at 654; *Lediju v. New York City Dep't of Sanitation*, 173 F.R.D. at 114; *Hernandez v. New York City Law Dep't*, 1997 WL 27047 at *12; *Burger v. Litton*, 1996 WL 421449 at *8.

■ Similarly, "[i]n order to make out a prima facie case of retaliation, a plaintiff must show by a preponderance of the evidence (i) participation in a protected activity known to the defendant; (ii) an employment action disadvantaging the plaintiff; and (iii) a causal connection between the protected activity and the adverse employment action." *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1308 (2d Cir.1995); *accord, e.g., Gallagher v. Delaney*, 139 F.3d 338, 349 (2d Cir.1998); *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 714 (2d Cir. 1996); *Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d 1033, 1039 (2d Cir.1993); *Kotcher v. Rosa & Sullivan Appliance Ctr., Inc.*, 957 F.2d 59, 64 (2d Cir.1992); *Hernandez v. New York City Law Dep't*, 1997 WL 27047 at *12 (citing cases); *Burger v. Litton*, 1996 WL 421149 at *12 n. 10; *Lediju v. New York City Dep't of Sanitation*, 173 F.R.D. at 113; *Burrell v. City Univ.*, 894 F.Supp. 750, 759–60 (S.D.N.Y.1995).

If the plaintiff establishes a prima facie case, the burden shifts to the defendant to rebut the presumption of discrimination by articulating a legitimate, non-discriminatory reason for its employment decision. *E.g., O'Connor v. Consol. Coin*, 517 U.S. at 311, 116 S.Ct. at 1309; *St. Mary's v. Hicks*, 509 U.S. at 506–07, 113 S.Ct. at 2747; *Texas v. Burdine*, 450 U.S. at 253–54, 101 S.Ct. at 1093–94; *McDonnell Douglas v. Green*, 411 U.S. at 802, 93 S.Ct. at 1824; *Stern v. Trustees of Columbia Univ.*, 131 F.3d at 312; *Scaria v. Rubin*, 117 F.3d at 654; *Fisher v. Vassar College*, 114 F.3d at 1335; *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d at 38; *Lediju v. New York City Dep't of Sanitation*, 173 F.R.D.

at 114; *Hernandez v. New York City Law Dep't,* 1997 WL 27047 at *12; *Burger v. Litton,* 1996 WL 421449 at *8; *Pearson v. Metro–North Commuter R.R.,* 1990 WL 20173 at *2. The burden on the defendant at this phase is one of production rather than persuasion. *E.g., St. Mary's v. Hicks,* 509 U.S. at 507, 113 S.Ct. at 2747; *Texas v. Burdine,* 450 U.S. at 257, 101 S.Ct. at 1096; *Scaria v. Rubin,* 117 F.3d at 654; *Fisher v. Vassar College,* 114 F.3d at 1335; *Lediju v. New York City Dep't of Sanitation,* 173 F.R.D. at 114; *Hernandez v. New York City Law Dep't,* 1997 WL 27047 at *12; *Burger v. Litton,* 1996 WL 421449 at *8. "Any legitimate, non-discriminatory reason will rebut the presumption triggered by the prima facie case." *Fisher v. Vassar College,* 114 F.3d at 1335–36. "It is important to note ... that although the *McDonnell Douglas* presumption shifts the burden of production to the defendant, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." " *Fisher v. Vassar College,* 114 F.3d at 1335 (quoting *St. Mary's v. Hicks,* 509 U.S. at 507, 113 S.Ct. at 2747); *see also, e.g., Scaria v. Rubin,* 117 F.3d at 654.

■ If the defendant articulates a non-discriminatory reason, the *McDonnell Douglas* burden-shifting framework drops out of the picture. *See, e.g., St. Mary's v. Hicks,* 509 U.S. at 510, 113 S.Ct. at 2749; *Texas v. Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093–94; *Scaria v. Rubin,* 117 F.3d at 654; *Fisher v. Vassar College,* 114 F.3d at 1336. At this point, "[i]n order to defeat summary judgment after such a showing by the defendant, the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." *Stern v. Trustees of Columbia Univ.,* 131 F.3d at 312; *see also, e.g., Fisher v. Vassar College,* 114 F.3d at 1336; *Cronin v. Aetna Life Ins. Co.,* 46 F.3d 196, 204 (2d Cir.1995); *Chambers v.*

*TRM Copy Ctrs. Corp.,* 43 F.3d at 38; *Scaria v. Rubin,* 1996 WL 389250 at *10. In other words, plaintiff must show that defendant's reason was pretextual, and more likely than not discrimination was the true reason for the adverse employment consequence. *See, e.g., Scaria v. Rubin,* 117 F.3d at 654; *Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d at 38; *Lediju v. New York City Dep't of Sanitation,* 173 F.R.D. at 114; *Hernandez v. New York City Law Dep't,* 1997 WL 27047 at *12; *Burger v. Litton,* 1996 WL 421449 at *8. "Accordingly, a Title VII plaintiff may prevail only if an employer's proffered reasons are shown to be a pretext for discrimination, either because the pretext finding itself points to discrimination or because other evidence in the record points in that direction—or both." *Fisher v. Vassar College,* 114 F.3d at 1339. The Court's role at this stage is to determine whether plaintiff has presented sufficient evidence to support a verdict of discrimination. As the Second Circuit stated:

"When a court comes to consider, either upon defendant's motion for summary judgment, or after a plaintiff's verdict, whether the evidence can support a verdict of discrimination, ... the judge must analyze the evidence, along with the inferences that may be reasonably drawn from it, and decide if it raises a jury question as to whether the plaintiff was the victim of discrimination. If so, summary judgment must be denied and/or a jury verdict for plaintiff must be sustained. If not, the defendant is entitled to summary judgment or to the overturning of a plaintiff's verdict as clearly erroneous."

*Stern v. Trustees of Columbia Univ.,* 131 F.3d at 312 (quoting *Fisher v. Vassar College,* at 1347); *see also, e.g., Scaria v. Rubin,* 117 F.3d at 654.

## II. *ADENIJI'S COMPLAINTS REGARDING ACTS ALLEGEDLY COMMITTED BEFORE OCTOBER 6, 1995 ARE TIME BARRED*

■ Adeniji's claims based upon events which occurred more than 180 days before

he filed his discrimination charge with the EEOC on April 3, 1996, *i.e.*, before October 6, 1995, are time barred.

■ Title VII "requires a claimant to file a charge of discrimination with the EEOC within 180 days of the alleged unlawful employment action or, if the claimant has already filed the charge with a state or local equal employment agency, within 300 days of the alleged discriminatory action." *Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 712 (2d Cir. 1996); *see also, e.g.,* 42 U.S.C. § 2000e–5(e); *Gomes v. Avco Corp.,* 964 F.2d 1330, 1332–33 (2d Cir.1992); *Pell v. Trustees of Columbia Univ.,* 97 Civ. 0193, 1998 WL 19989 at *4 (S.D.N.Y. Jan. 21, 1998) (Sotomayor, D.J.). Only events during that time period are actionable under Title VII in federal court. *E.g., Van Zant v. KLM,* 80 F.3d at 712.

■ Thus, Adeniji's only surviving claims are those based upon events which transpired within 180 days of his filing his EEOC complaint on April 3, 1996, *i.e.*, only events after October 6, 1995.[4]

Accordingly, Adeniji's claims that (1) in 1988 "[o]nly [he] was given the I & R and COS full caseloads which is clearly discriminatory by gender ... and national origin" (Adeniji Br. at 4; Adeniji Rule 56.1 Stmt. ¶ 12); (2) during that time he was "the only one given a negative evaluation when the caseworkers within the Unit are experiencing difficulty closing the cases in a timely manner" (Adeniji Br. at 4); (3) he was "never accorded same career opportunity for advancement or given the chance to become a stable, constructive staff member of ACS" (Adeniji Br. at 3); (4) his reassignment to unit 374 in 1988 was malicious and discriminatory (Adeniji Br. at 4; Adeniji Rule 56.1 Stmt. ¶ 21); (5) he was isolated from his peers from 1988–91 (Adeniji Br. at p. 3–8); and (6) he was retalia-

torily transferred in 1991 (Adeniji Br. at p. 3–8), are therefore all time barred.

■ Adeniji's claim that he was "selectively reprimanded between 1988 and 1997 for being outspoken on governmental waste, altering of documents and inefficiency" (Adeniji Rule 56.1 Stmt. ¶ 11) is time barred in part—to the extent it involves pre-October 6, 1995 acts—and in any event is not cognizable in this case since Title VII does not protect whistleblowers. *See, e.g., Jamil v. Secretary, Dep't of Defense,* 910 F.2d 1203, 1207 (4th Cir.1990) ("'Title VII is not a general 'bad acts' statute; it only addresses discrimination on the basis of race, sex, religion, and national origin, not discrimination for whistleblowing."); *Simmons v. Shalala,* 946 F.Supp. 415, 420 (D.Md.1996) ("To the extent that Plaintiff is claiming that she was retaliated against for being a whistle blower regarding fraud and mismanagement, such claim is not cognizable under Title VII which only protects against retaliation for claims of discrimination."); *Fitzgibbon v. Sanyo Sec. Am., Inc.,* 92 Civ. 2818, 1994 WL 281928 at *5 (S.D.N.Y. June 22, 1994).

The remainder of Adeniji's claims are addressed below.

### III. *ACS SHOULD BE GRANTED SUMMARY JUDGMENT AS TO ADENIJI'S RACIAL DISCRIMINATION CLAIM BECAUSE ONE RACIALLY BIASED COMMENT IS INSUFFICIENT TO CREATE A HOSTILE WORK ENVIRONMENT, AND ADENIJI FAILED TO SHOW HE WAS TREATED DIFFERENTLY THAN PERSONS OUTSIDE THE PROTECTED RACE AND NATIONAL ORIGIN CLASSES*

ACS alleges that Adeniji's claims of race and national origin discrimination, while not clearly labeled, appear to be based on hostile work environment and disparate

---

**4.** The NYC HRA EEO office is not a "state or local agency" under 42 U.S.C. § 2000e–5(c) & (e); it is merely the equal employment office of a city agency. The New York State Division of Human Rights and New York City Commission on Human Rights are "state or local agencies" within the meaning of 42 U.S.C. § 2000e–5(c).

treatment theories. (ACS Br. at 5.) The Court agrees.

### A. *Hostile Work Environment*

■ To establish a hostile work environment claim, Adeniji must allege ACS's conduct was:

> "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys.*, 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986)) (internal brackets and quotation marks omitted). The conduct must be intimidating, hostile, or offensive, with discriminatory intimidation, ridicule, and insult permeating the workplace. *See Tomka v. Seiler Corp.*, 66 F.3d 1295, 1305 (2d Cir.1995). All of the circumstances must be considered; a reasonable person would have to find the environment hostile or abusive, and the victim must have subjectively so perceived it. *See Harris v. Forklift Sys.*, 510 U.S. 17, 21–23, 114 S.Ct. 367, 370–71, 126 L.Ed.2d 295 (1993); *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1305 (2d Cir. 1995).

*Gallagher v. Delaney*, 139 F.3d 338, 346–47 (2d Cir.1998); *see also, e.g., Torres v. Pisano*, 116 F.3d 625, 630 (2d Cir.), *cert. denied*, —— U.S. ——, 118 S.Ct. 563, 139 L.Ed.2d 404 (1997); *Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d 1033, 1042 (2d Cir.1993); *Ortega v. New York City Off-Track Betting Corp.*, 97 Civ. 7582, 1998 WL 355416 at *3 (S.D.N.Y. July 1, 1998) (Wood, D.J.). "Conduct that is 'merely offensive' and 'not severe or pervasive enough to create an objectively hostile or abusive work environment'" is insufficient to establish a Title VII discrimination claim. *Torres v. Pisano*, 116 F.3d at 631.

■ A single incident of discriminatory comments is not sufficient to establish a hostile work environment. *E.g., Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 2283, 141 L.Ed.2d 662 (1998) (" 'simple teasing,' . . . offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.' "); *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993) (" 'mere utterance of an . . . epithet which engenders offensive feelings in an employee,' . . . does not sufficiently affect the conditions of employment to implicate Title VII"); *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 768 (2d Cir.1998) ("As a general matter, 'isolated remarks or occasional episodes of harassment will not merit relief under Title VII; in order to be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive.' "); *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) ("For racist comments, slurs, and jokes to constitute a hostile work environment, there must be 'more than a few isolated incidents of racial enmity,' . . . meaning that '[i]nstead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments.' "); *Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1189 (2d Cir.1987) ("to demonstrate a hostile work environment more than an episodic pattern of racial antipathy must be proven to obtain statutory relief"); *Snell v. Suffolk County*, 782 F.2d 1094, 1103 (2d Cir.1986) ("To establish a hostile atmosphere . . . plaintiffs must prove more than a few isolated incidences of racial enmity."); *Pomilio v. Wachtell Lipton Rosen & Katz*, 97 Civ. 2230, 1999 WL 9843 at *6 (S.D.N.Y. Jan. 11, 1999) ("plaintiff's allegations . . . do not establish hostile work environment harassment. . . . [A]lthough plaintiff may have found some of her employers' alleged comments objectionable, those comments were 'sufficiently isolated and discrete that a trier of fact could not reasonably conclude that they pervaded [plaintiff's] work environment.' "); *Carter v. Cornell Univ.*, 976 F.Supp. 224, 232 (S.D.N.Y.1997) (Motley, D.J.), *aff'd mem.*, 159 F.3d 1345 (2d

Cir.1998); *Smith v. Planas,* 975 F.Supp. 303, 309 (S.D.N.Y.1997); *O'Connor v. Viacom Inc.,* 93 Civ. 2399, 1996 WL 194299 at *5 (S.D.N.Y. April 23, 1996) ("three isolated remarks, the only proffered evidence of national origin discrimination, are insufficient to establish pretext," citing cases), *aff'd mem.,* 104 F.3d 356 (2d Cir.1996).

### 1. *Race*

It is undisputed that Mirta LaFontaine, a caseworker at ACS's Bronx Field Office where Adeniji worked, said to Adeniji something to the effect of "you [are] not a king in Africa anymore, that you [are] subject to the rules of our office." (Ligorner Aff.Ex. D & Adeniji Aff.Ex. B: LaFontaine Dep. at 14–15; Adeniji Rule 56.1 Stmt. ¶ 22; ACS Rule 56.1 Stmt. ¶ 14; Ligorner Aff.Ex. A: Adeniji Dep. at 182.) Adeniji claims that LaFontaine's comment and the fact that ACS Bronx Borough Director Nunez did not obtain an apology from LaFontaine amounts to race and national origin discrimination. (Adeniji Rule 56.1 Stmt. ¶ 22.) LaFontaine's one comment, however, is clearly insufficient to meet the "severe and pervasive conduct test" under Title VII. *See* cases cited at page 422 above. Adeniji has conceded that LaFontaine's remark was the only racial remark made to him by anyone at ACS. (Ligorner Aff.Ex. A: Adeniji Dep. at 307, 354.) Nor is it so severe as to amount to discriminatory changes in the terms and conditions of Adeniji's employment. Accordingly, ACS's summary judgment motion should be granted with respect to Adeniji's race discrimination claim.

### 2. *National Origin*

■ Adeniji's proof of hostile work environment based on national origin discrimination, in addition to LaFontaine's comment, is "[t]he selective reprimand of plaintiff ... whenever plaintiff complains of any maltreatment." (Adeniji Br. at 22.) Adeniji, however, provided no evidence that his nationality (African) was the cause of any such reprimand or maltreat-

ment. His conclusory allegations are insufficient to state a prima facie case of national origin hostile environment discrimination. *See, e.g., Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) ("even in the discrimination context, a plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment"); *Smith v. American Express Co.,* 853 F.2d 151, 155 (2d Cir.1988) (summary judgment for employer because plaintiff's "affidavit and memorandum reveal nothing that would convince a factfinder that the reasons given by [his employer] for promoting [another employee] rather than [plaintiff] were a pretext for discrimination. Rather his allegations are conclusory and unsupported by evidence of any weight; they are insufficient to satisfy the requirements under Rule 56(e)."); *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.) ("conclusory allegations of discrimination are insufficient to satisfy the requirements of Rule 56(e).... To allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases. Given the ease with which these suits may be brought and the energy and expense required to defend such actions, we believe the trial judge properly granted summary judgment."), *cert. denied,* 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985); *Ortega v. New York City Off–Track Betting Corp.,* 97 Civ. 7582, 1998 WL 355416 at *4 (S.D.N.Y. July 1, 1998) (Wood, D.J.) (dismissing plaintiff's hostile work environment claims because "the complaint contains only conclusory allegations in support of plaintiff's claims under Title VII"); *Little v. New York,* 96 Civ. 5132, 1998 WL 306545 at *6 (E.D.N.Y. June 8, 1998) ("it is well settled that a plaintiff's speculations, generalities, and gut feelings, however genuine, when they are not supported by specific facts, do not allow for an inference of discrimination to be drawn.... Accordingly, a Title VII plaintiff cannot 'defeat a motion for sum-

mary judgment by offering purely conclusory allegations of discrimination.' "); *Robinson v. Metro–North Commuter R.R.*, 94 Civ. 7374, 95 Civ. 8594, 1998 WL 17742 at *8 (S.D.N.Y. Jan. 16, 1998) (dismissing plaintiffs' claims of hostile working environment for failure to "make any specific allegations or provide any particularized admissible evidence to support [the] general claim"); *Jugueta v. Perry*, 95 Civ. 10303, 1997 WL 742535 at *6 (S.D.N.Y. Dec. 1, 1997) ("speculation does not constitute evidence sufficient to defeat a summary judgment motion"); *Taylor v. Runyon*, 97 Civ. 2425, 1997 WL 727488 at *5 (S.D.N.Y. Nov. 20, 1997) ("conclusory allegations are not sufficient to state a cause of action for disparate treatment based on race"); *Richardson v. Newburgh Enlarged City Sch. Dist.*, 984 F.Supp. 735, 744 (S.D.N.Y.1997) ("[T]he supposed mountain of racial resentment more closely resembles a molehill of non-racial, and possibly justifiable, annoyance.... Simply because (1) some [co-workers] had complaints about [plaintiff], and (2) [plaintiff] is African–American, does not impel the conclusion that (3) those [co-workers] had misgivings about [plaintiff] because she is African–American. This is the type of groundless speculation that summary judgment is designed to root out."); *Lediju v. New York City Dep't of Sanitation*, 173 F.R.D. 105, 114 (S.D.N.Y.1997) (Peck, M.J.) ("Plaintiff's speculation and generalities (*e.g.*, discrimination is self-evident), ... is insufficient even to state a prima facie case...."); *Burrell v. Bentsen*, 91 Civ. 2654, 1993 WL 535076 at *10 (S.D.N.Y. Dec. 21, 1993) ("plaintiff cannot satisfy his burden of proof by offers of speculative beliefs and gut feelings"), *aff'd mem.*, 50 F.3d 3 (2d Cir.1995); *Ulrich v. Exxon Co. USA*, 824 F.Supp. 677, 685–86 (S.D.Tex.1993) ("A subjective belief of discrimination, however genuine, cannot alone be the basis for judicial relief.... [Plaintiff's] proffered summary judgment evidence consists exclusively of conclusory and speculative allegations of race discrimination which are unsupported by specific facts. In the court's view, this evidence is insufficient to support a prima facie case of employment discrimination or to raise a genuine issue of material fact."); *Lim v. Citizens Sav. & Loan Ass'n*, 430 F.Supp. 802, 814 (N.D.Cal.1976) (plaintiff's conclusory affidavit that she "believ[ed][she] was discriminatorily treated" insufficient to establish prima facie case or defendant has rebutted her story with such overwhelming evidence of legitimate reasons that summary judgment is appropriate).[5]

ACS is entitled to summary judgment dismissing Adeniji's race and national origin hostile environment discrimination claims.

### B. *Disparate Treatment*

■■■■ A disparate treatment claim is one in which the employer "simply treats some people less favorably than others because of their race, color, religion" or national origin. *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 609, 113 S.Ct. 1701, 1705, 123 L.Ed.2d 338 (1993). To state a disparate treatment claim under Title VII, Adeniji must allege: (1) he is a member of a protected class; (2) he satisfactorily performed the duties of his position; (3) he was subject to an adverse employment action; and (4) the adverse employment action occurred in circumstances giving rise to an inference of discrimination on the basis of membership in the protected class. *See* cases cited at pages 419–420 above.

Adeniji satisfies the first prong because he is black and from Nigeria. As for the second prong, the Second Circuit recommended that district courts look to employ-

---

5. The Court need not determine whether any alleged acts present an issue for the jury under the standards enunciated by Judge Weinstein for the Second Circuit in *Gallagher v. Delaney*, 139 F.3d 338, 347 (2d Cir.1998), because Adeniji failed to make out a prima facie case of national origin discrimination: Adeniji offered no evidence of any acts, ambiguous or unambiguous, of national origin discrimination.

er evaluations to determine whether plaintiff's job performance was satisfactory:

> In determining whether an employee's job performance is satisfactory, courts may—as they often must—rely on the evaluations rendered by supervisors. After all, job performance cannot be assessed in a vacuum; the ultimate inquiry is whether an employee's performance "meets his employer's legitimate expectations." Although courts must refrain from intruding into an employer's policy apparatus or second-guessing a business's decisionmaking process, they must allow employees "to show that the employer's demands were illegitimate or arbitrary."

*Meiri v. Dacon*, 759 F.2d 989, 995 (2d Cir.1985) (citations omitted), *cert. denied,* 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985); *accord, e.g., Guider v. F.W. Woolworth Corp.*, 96 Civ. 3168, 1998 WL 702275 at *8 (S.D.N.Y. Oct. 7, 1998); *Kenner v. Glasheen*, 92 Civ. 0653, 1997 WL 651477 at *6 (S.D.N.Y. Oct. 17, 1997); *O'Connor v. Viacom Inc.*, 93 Civ. 2399, 1996 WL 194299 at *5–6 (S.D.N.Y. April 23, 1996), *aff'd mem.*, 104 F.3d 356 (2d Cir.1996); *Dzaba v. Willcox Inc. Reins. Intermediaries*, 93 Civ. 8607, 1996 WL 39297 at *5 (S.D.N.Y. Feb. 1, 1996), *aff'd mem.*, 107 F.3d 2 (1997). While Adeniji's proof is comparatively thin, looking at the evidence in the light most favorable to Adeniji, as we must, the Court assumes that he satisfied his burden on the second prong.[6]

Adeniji satisfied the third prong since he was terminated.

■ Adeniji did not, however, satisfy his burden on the fourth prong, because he failed to show that he was treated differently than persons outside the relevant protected classes. Adeniji does not state any disparate treatment claims based on race or national origin in his summary judgment papers. His amended complaint, however, alleges that he was "selectively punished in that [he] was transferred to the Central Office and several Units," and was denied leave time when his mother passed away. (Am.Cplt.¶ 8.) The Court construes these statements as alleging disparate treatment.

Notwithstanding the voluminous deposition and exhibit transcripts Adeniji submitted, he failed to provide any proof to substantiate his claims. Construing Adeniji's amended complaint liberally, the Court assumes that his selective punishment claim refers to the reassignment from MILs to unit 376 in October 1995, and the fifteen day reassignment to the central home care unit in December 1995. Nevertheless, Adeniji presented no evidence that similarly situated employees of other races and national origins were not transferred to other units or reassigned for fifteen days. Nor did he show that he was singled out to be reassigned specifically to unit 376 while employees of other races and national origins remained in MILs or that unit 376

---

**6.** Adeniji submitted 1991 and 1992 job evaluations rating his performance as adequate (Adeniji Aff.Ex. J), but these are irrelevant to his job performance in 1995–1996, the period at issue in this action. In addition, Adeniji submitted a very positive job performance letter from Charlotte Bailey, who supervised Adeniji in the PD unit from November 1995 to January 1996. She described Adeniji as "skillful at matching parent's and child's needs with governmental criteria," "dependable, reliable and courteous." (Adeniji Aff.Ex. L: 4/4/96 Bailey Letter.) He also submitted a memorandum from Jo–Carole Gibson, Adeniji's supervisor in the 316 homemaking unit, who requested that he be transferred back to the unit, and stated that Adeniji "has assisted the homemaking unit in many ways and I would consider him an asset to the unit." (Adeniji Aff.Ex. L: 8/28/95 Gibson Memo.)

On the other hand, ACS presented at least nineteen memoranda written by Adeniji's supervisors complaining about his improper, aggressive and threatening behavior, unprofessionalism and uncompleted assignments. (*See* Adeniji Aff.Ex. J; Ligorner Aff. Ex. C; ACS Rule 56 Stmt. ¶ 9.) ACS also presented letters from other professionals and clients with whom Adeniji worked complaining about his performance. (Ligorner Aff.Ex. B.)

was a less desirable unit to work in.[7] Evidence of a transfer alone is insufficient to make out a case of discrimination. *See, e.g., Garber v. New York City Police Dep't,* 159 F.3d 1346 (table), No. 97–9191, 1998 WL 514222 at *4 (2d Cir. June 12, 1998) ("We agree that '[o]bviously a pure lateral transfer, that is, a transfer that does not involve a demotion in form or substance, cannot rise to the level of a materially adverse employment action. A transfer involving no reduction in pay and no more than a minor change in working conditions will not do either.' ... Plaintiff, conceding that his change in position has not threatened his salary or benefits, attempts to rest his assertion that the transfer constituted an adverse employment action only on his unhappiness at being removed from a position he 'cherished.' It is not enough. In the circumstances here presented, we are unable to find that plaintiff's transfer constituted a materially adverse change in the terms and conditions of employment.") (quoting *Williams v. Bristol–Myers Squibb Co.,* 85 F.3d 270, 274 (7th Cir.1996) (Posner, C.J.)); *Lambert v. Genesee Hosp.,* 10 F.3d 46, 58 (2d Cir.1993) ("The district court also properly granted summary judgment for the defendants on plaintiffs' Title VII ... claims of discrimination in the transfer of employees to the 360 and 385 presses, since the plaintiffs failed to produce any evidence to support an inference of discriminatory motive in the assignment of employees to the various printer positions."), *cert. denied,* 511 U.S. 1052, 114 S.Ct. 1612, 128 L.Ed.2d 339 (1994); *Little v. New York,* 96 Civ. 5132, 1998 WL 306545 at *5–6 (E.D.N.Y. June 8, 1998) ("The realities of the workplace dictate that employees do not always have the option to work in the location they desire. Employees must often go where the employer determines they are needed most...." Mere "speculat[ion] as to the reasons for [plaintiff's] transfer" does "not allow for an inference of discrimination to be drawn"); *Mishk v. Destefano,* 5 F.Supp.2d 194, 202 (S.D.N.Y.1998) ("Plaintiff's ... transfer from [one] Unit to [another] Unit does not satisfy the adverse employment action standard in the absence of any allegation or evidence that the new position was somehow inferior to plaintiff's previous position."); *Cooper v. New York State Dep't of Human Rights,*

7. Furthermore, the other unit 376 caseworkers were all African, so while Adeniji was the only person in unit 376 assigned homemaking work while the others were assigned protective diagnostic work and homemaking work (Ligorner Aff.Ex. A: Adeniji Dep. at 200, 299), he cannot claim that employees outside the Title VII protected class were treated differently than those within the protected class. *See, e.g., Harmon v. Runyon,* 96 Civ. 6080, 1997 WL 786383 at *5 (S.D.N.Y. Dec. 19, 1997) (plaintiff failed to show she suffered disparate treatment when she was assigned different tasks from her co-workers, who were of the same race as plaintiff); *Smith v. Planas,* 975 F.Supp. 303, 308 (S.D.N.Y.1997) ("Five of the seven individuals identified by Plaintiff as having received higher-paying assignments were black—members of Plaintiff's protected class. As such, Plaintiff has failed to make out a prima facie case of race discrimination because he cannot show that the adverse employment action taken against him occurred in circumstances giving rise to an inference of race discrimination."); *Samuels v. New York State Dep't of Correctional Servs.,* 94 Civ. 8645, 1997 WL 253209 at *5 (S.D.N.Y. May 14, 1997) (summary judgment for defendants because "[t]wo of the four promotions of which [plaintiff] complains were, in fact, promotions of black males—members of the protected class of which plaintiff is a member. As such, plaintiff has failed to make out a prima facie case of race discrimination, because she cannot show that the adverse employment action taken against her—defendants' delay in promoting her—occurred in circumstances giving rise to an inference of race discrimination."); *Thornton v. Simpson Thacher & Bartlett,* 83 Civ. 8409, 1986 WL 6012 at *4 (S.D.N.Y. May 21, 1986) (directed verdict for defendant because "[p]laintiff relies on the contention that two white employees ... had equally poor attendance records, but were not placed on probation. Plaintiff's testimony shows, however, that two other black employees with allegedly poor records were also not placed on probation. The most this establishes, even in the light most favorable to the plaintiff, is that she was treated differently from all other employees, both white and black."), *aff'd mem.,* 833 F.2d 1003 (2d Cir.1986).

986 F.Supp. 825, 828 (S.D.N.Y.1997) ("the mere fact that an employee has been transferred or that his job responsibilities have changed is not sufficient in itself to show an adverse change in working conditions").

In sum, Adeniji presented no evidence of disparate treatment. Conclusory allegations are not sufficient. *See* cases cited at pages 424–426 above. Accordingly, ACS's summary judgment motion should be granted with respect to Adeniji's race and national origin discrimination claims.

## IV. *ACS SHOULD BE GRANTED SUMMARY JUDGMENT AS TO ADENIJI'S RELIGIOUS DISCRIMINATION CLAIM BECAUSE ADENIJI FAILED TO ASSERT SUCH CLAIM BEFORE THE EEOC*

■ Adeniji's EEOC complaint against the ACS alleged retaliation, sex and national origin discrimination, and in the particulars section of the complaint, race discrimination, but Adeniji did not allege religious discrimination. (Ligorner Aff. Ex. M.)

■ " 'Filing a charge with the EEOC is a jurisdictional prerequisite to a private civil action under Title VII.' " *Hernandez v. New York City Law Dep't*, 94 Civ. 9042, 1997 WL 27047 at *8 (S.D.N.Y. Jan. 23, 1997) (Peck, M.J.); *accord, e.g.,* 42 U.S.C. § 2000e–5(e); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 798, 93 S.Ct. 1817, 1822, 36 L.Ed.2d 668 (1973); *Butts v. City of New York Dep't of Housing Preservation & Dev.*, 990 F.2d 1397, 1401 (2d Cir.1993) ("A district court only has jurisdiction to hear Title VII claims that either are included in an EEOC charge or are based on conduct subsequent to the EEOC charge which is 'reasonably related' to that alleged in the EOC charge."); *Johnson v. Palma*, 931 F.2d 203, 209 (2d Cir.1991); *Rivera v. Baccarat, Inc.*, 95 Civ. 9478, 1996 WL 251850 at *2 (S.D.N.Y. May 10, 1996); *Dortz v. City of New York*, 904 F.Supp. 127, 142 (S.D.N.Y.1995); *Chojar v. Levitt*, 773 F.Supp. 645, 650 (S.D.N.Y.1991). "Judicial relief cannot be sought for claims not listed in the original EEOC charge unless they are 'reasonably related' to the charge." *Hernandez v. New York City Law Dep't*, 1997 WL 27047 at *8 (quoting *Chojar v. Levitt*, 773 F.Supp. at 650) (quoting *Stewart v. United States Immigration & Naturalization Serv.*, 762 F.2d 193, 197–98 (2d Cir.1985)); *see also, e.g., Butts v. City of New York Dep't of Housing*, 990 F.2d at 1401; *Rivera v. Baccarat, Inc.*, 1996 WL 251850 at *2.[8]

■ While "a plaintiff's EEOC charge should be construed liberally," especially for a pro se plaintiff, " 'there is a difference between liberally reading a claim which "lacks specificity," and inventing, ex nihilo, a claim which simply was not made.' " *Rivera v. Baccarat, Inc.*, 1996 WL 251850 at *2 (quoting *Shannon v. Ford Motor Co.*, 72 F.3d 678, 685 (8th Cir.1996)); *accord, e.g., Hernandez v. New York City Law Dep't*, 1997 WL 27047 at *8.

Adeniji's EEOC complaint against ACS could not be clearer. He checked only the "sex," "national origin" and "retaliation" boxes on the EEOC complaint form, not the box for religious discrimination. (Ligorner Aff.Ex. M.) Under "particulars," he claimed that he was "retaliated against because [he] complained to management regarding the treatment of [his] African co-workers and mismanagement and fabrication of the number of cases," "subjected

---

**8.** The "reasonably related" doctrine, for example, allows the Court to exercise jurisdiction over " 'incidents occurring after the filing of the EEOC claim,' " *Hernandez v. New York City Law Dep't*, 1997 WL 27047 at *8; *Stewart v. United States Immigration & Naturalization Serv.*, 762 F.2d at 198, including retaliation for filing the EEOC charge. *See, e.g., Butts v. City of New York Dep't of Housing*, 990 F.2d at 1402 ("The second type of 'reasonably related' claim is one alleging retaliation by an employer against an employee for filing an EEOC charge."); *Malarkey v. Texaco, Inc.*, 983 F.2d 1204, 1208–09 (2d Cir.1993); *Hernandez v. New York City Law Dep't*, 1997 WL 27047 at *8; *Dortz v. City of New York*, 904 F.Supp. at 140–41 & n. 4.

to unwelcome sexual harassment by the Deputy Director," was "subjected to racial remarks by the Special Assistant to the Director," "selectively punished," and "discriminated against because of [his] sex (Male) and national origin (African)." (Ligorner Aff.Ex. M.) There simply is no allegation in his EEOC complaint of religious discrimination.

Adeniji's religious discrimination claim, therefore, should be dismissed.

## V. ACS SHOULD BE GRANTED SUMMARY JUDGMENT AS TO ADENIJI'S RETALIATION CLAIM BECAUSE ADENIJI FAILED TO SHOW THAT HE WAS TERMINATED IN RETALIATION FOR FILING HIS EEO AND EEOC COMPLAINTS

Claims of retaliation in violation of Title VII, like discrimination claims, are analyzed under the three-step burden-shifting test of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973). *See, e.g., Gallagher v. Delaney*, 139 F.3d 338, 348 (2d Cir.1998).

As noted above, to establish a prima facie case of retaliation, plaintiff must show (1) participation in an activity protected under Title VII; (2) the employer was aware of plaintiff's participation in the protected activity; (3) the employer took adverse action against plaintiff based on his protected activity; and (4) a causal connection existed between the plaintiff's protected activity and the adverse action taken by the employer. *See* cases cited at pages 419–420 above.

While Adeniji's papers are less than clear, he contends that ACS's retaliatory acts consist of: (1) reassignment to MILS unit noticed on July 7, 1995 and effected on November 27, 1995 (Adeniji Rule 56.1 Stmt. ¶ 21; Adeniji Br. at 32); (2) reas-

signment to the central home care office for fifteen days commencing on December 15, 1995 (Adeniji Rule 56.1 Stmt. ¶ 23; Adeniji Br. at 33–34); (3) overloading Adeniji with new cases from March 7 to March 11, 1996 (Adeniji Br. 34–35); (4) suspension for thirty days in November 1996 (Adeniji Br. at 36); and (5) termination in March 1997. (Adeniji Br. at 36.)

■ Adeniji satisfied the first and second prongs of a prima facie case when he filed a complaint with his employer's EEO office on April 2, 1996 and a charge of discrimination with the EEOC on April 3, 1996. (Adeniji Rule 56.1 Stmt. ¶ 32; Ligorner Aff.Exs. K, M.) ACS obviously was aware at least of Adeniji's April 2, 1996 filing. However, Adeniji failed to satisfy the third prong with respect to claims based on actions (the November 1995 and December 1995 reassignments and burdensome caseload) taken prior to April 2, 1996. ACS should be granted summary judgment on these three claims.[9] *See, e.g., DuBois v. New York*, 966 F.Supp. 144, 148 (N.D.N.Y.1997) ("The alleged [retaliatory] transfer and inappropriate duties necessarily preceded plaintiff's March 12, 1996 EEOC complaint since defendant terminated her on July 22, 1995. Thus, ostensibly there can be no factual connection between these two events."); *Doria v. Cramer Rosenthal McGlynn, Inc.*, 942 F.Supp. 937, 943 (S.D.N.Y.1996) ("the majority of the discriminatory acts which [plaintiff] alleges were taken in response to her EEO complaint took place prior to [the date plaintiff filed her EEO complaint], and therefore could not have been retaliatory").

■ As for Adeniji's thirty day suspension in November 1996 and his termination in March 1997, these events occurred after Adeniji filed his complaints with the EEO and the EEOC in April 1996. The Court

---

9. The Court notes that while the protected activity need not be a formal charge of discrimination with the EEOC, *see, e.g., Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir.1990); *Doria v. Cramer Rosenthal McGlynn, Inc.*, 942 F.Supp. 937, 943 n. 7 (S.D.N.Y.1996), Adeniji has not claimed that he informally notified management of discrimination.

assumes, therefore, that with respect to his suspension and termination, Adeniji made out a prima facie case of retaliation. Under *McDonnell Douglas,* the burden shifts to ACS to produce evidence of non-retaliatory reasons for its actions. Between 1993 and 1995, Adeniji's supervisors wrote him up at least nineteen times for improper, aggressive and threatening behavior, unprofessionalism and uncompleted assignments. (*See* Adeniji Aff.Ex. J; Ligorner Aff.Ex. C; ACS Rule 56.1 Stmt. ¶ 9.) Adeniji was served with a disciplinary notice on March 21, 1996 (before his April 2–3 EEOC complaints) and another on November 6, 1996 in which he was charged with threatening and disruptive behavior; displaying "violent and inappropriate and threatening physical behavior toward Ms. Eillen Anderson;" "shouting and cursing in front of Mayra Juliao–Nunez," on July 11, 1995; becoming "violent . . . throwing things around and kicking the desk and chairs," on February 13, 1996; demanding that supervisor James Stewart sign Adeniji's Leave form and stating that " 'if [he] did not approve [the] two-day request [Adeniji] would not be responsible if [he] were to come to the office with a gun and shoot it up,' " and " 'unless [his leave] request was approved [he] would not be responsible for [his] actions which might include shooting up the office' "; "refus[ing] to carry out work assignments"; and repeatedly refusing to accept new pending cases. (Adeniji Aff.Ex. I; Ligorner Aff.Exs. J & K.) ACS thus showed valid, nondiscriminatory and non-retaliatory reasons for disciplining and firing Adeniji. *See, e.g., Pearson v. Metro–North Commuter R.R.,* 87 Civ. 6389, 1990 WL 20173 at *3 (S.D.N.Y. March 8, 1990) (Wood, D.J.) (employer demonstrated that employee was fired for nondiscriminatory reasons because employer fired employee "after a disciplinary hearing at which [the employee] admitted to disobeying two of his supervisors and responding with profanity to their direct orders. . . . [The employer] decided to dismiss [the employee] also because of his prior disciplinary rec-ord, which included nine separate instances of discipline in the past ten years"). The burden of proof thus shifted back to Adeniji to establish that ACS's reasons were pretextual.

Adeniji's response is that he was "selectively reprimanded between 1988 and 1997 for being outspoken on governmental waste altering of documents and inefficiency." (Adeniji Rule 56.1 Stmt. ¶ 11). Whether he was reprimanded for speaking out about governmental waste is irrelevant to whether he was fired for filing a complaint with the EEOC. See cases cited at page 423 above. His only response to the negative letters written by clients, supervisors and other professionals with whom he worked is that the letters were "conspiratorial and malicious." (Adeniji Rule 56.1 Stmt. ¶ 8.) Yet he failed to provide any evidence to back up his assertions.

To defeat ACS's motion for summary judgment, Adeniji was "obliged to produce not simply 'some' evidence, but 'sufficient evidence to support a rational finding that the legitimate, nondiscriminatory reasons proffered by the employer were false, and that more likely than not [retaliation] was the real reason for the discharge.' " *Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 714 (2d Cir.1996) (quoting *Woroski v. Nashua Corp.,* 31 F.3d 105, 110 (2d Cir.1994) (citing *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 515–17, 113 S.Ct. 2742, 2752, 125 L.Ed.2d 407 (1993))); *accord, e.g., Barrow v. Burke Rehabilitation Hosp., Inc.,* 998 F.Supp. 346, 349 (S.D.N.Y. 1998); *Gomez v. Pellicone,* 986 F.Supp. 220, 225–26 (S.D.N.Y.1997); *Brown v. Time, Inc.,* 95 Civ. 10081, 1997 WL 231143 at *12 (S.D.N.Y. May 7, 1997); *Hernandez v. New York City Law Dep't Corp. Counsel,* 94 Civ. 9042, 1997 WL 27047 at *7 (S.D.N.Y. Jan. 23, 1997) (Peck, M.J.). Adeniji simply failed to produce any evidence that ACS's articulated reason for suspending and firing him was a pretext for retaliation. ACS therefore is entitled to summary judgment with regard to the retaliation charge.

## VI. *ACS SHOULD BE GRANTED SUMMARY JUDGMENT AS TO ADENIJI'S SEXUAL HARASSMENT CLAIM BECAUSE ADENIJI DID NOT DEMONSTRATE THAT HE WAS SUBJECT TO UNWELCOME SEXUAL CONDUCT*

Title VII prohibits discrimination on the basis of sex with respect to "compensation, terms, conditions, or privileges of employment." 42 U.S.C. § 2000e–2(a)(1). The EEOC Guidelines on Discrimination Because of Sex, while not controlling, provide "substantial assistance in this area of agency expertise." *Gallagher v. Delaney*, 139 F.3d 338, 346 (2d Cir.1998); *see also, e.g., Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 65, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986). The EEOC Guidelines define sexual harassment as follows:

> Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual, or (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.

29 C.F.R. § 1604.11(a) (1998).

There are two theories under which sexual harassment cases proceed: "(1) quid pro quo—*e.g.*, favorable [or adverse] treatment in return for sought sexual favors, or (2) hostile work environment." *E.g., Gallagher v. Delaney*, 139 F.3d at 346; *Torres v. Pisano*, 116 F.3d 625, 630 (2d Cir.), *cert. denied*, — U.S. —, 118 S.Ct. 563, 139 L.Ed.2d 404 (1997); *Karibian v. Columbia Univ.*, 14 F.3d 773, 777 (2d Cir.), *cert. denied*, 512 U.S. 1213, 114 S.Ct. 2693, 129 L.Ed.2d 824 (1994); *Carrero v. New York City Hous. Auth.*, 890 F.2d 569, 577 (2d Cir.1989); *but cf. Burlington Indus.,*

*Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 2264, 141 L.Ed.2d 633 (1998) (cautioning as to the "limited utility" of the two terms).

### A. *Quid Pro Quo Harassment*

 " '[T]o establish a prima facie case of quid pro quo harassment, a plaintiff must present evidence that [he] was subject to unwelcome sexual conduct, and that [his] reaction to that conduct was then used as the basis for decisions affecting the compensation, terms, conditions or privileges of [his] employment.' " *Gallagher v. Delaney*, 139 F.3d 338, 346 (2d Cir.1998) (quoting *Karibian v. Columbia Univ.*, 14 F.3d 773, 777 (2d Cir.), *cert. denied*, 512 U.S. 1213, 114 S.Ct. 2693, 129 L.Ed.2d 824 (1994)); *accord, e.g., Gutierrez v. Henoch*, 998 F.Supp. 329, 334 (S.D.N.Y.1998); *Gibson v. Jacob K. Javits Convention Ctr.*, 95 Civ. 9728, 1998 WL 132796 at *5 (S.D.N.Y. March 23, 1998); *Pell v. Trustees of Columbia Univ.*, 97 Civ. 0193, 1998 WL 19989 at *14 (S.D.N.Y. Jan. 21, 1998) (Sotomayor, D.J.); *EEOC v. National Cleaning Contractors*, 90 Civ. 6398, 1997 WL 811494 at *5 (S.D.N.Y. Sept. 2, 1997). As the Supreme Court recently reiterated, in order for the unwanted sexual conduct to be actionable, "the conduct must be severe or pervasive." *Burlington Indus. Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 2265, 141 L.Ed.2d 633 (1998).

 In a "refusal" case—where the plaintiff rejected the alleged sexual advance—"the gravamen of a quid pro quo claim is that a tangible job benefit or privilege is conditioned on an employee's submission to sexual blackmail and that adverse consequences follow from the employee's refusal." *Carrero v. New York City Hous. Auth.*, 890 F.2d 569, 579 (2d Cir.1989); *see also, e.g., Karibian v. Columbia Univ.*, 14 F.3d at 778 ("The relevant inquiry in a quid pro quo case is whether the supervisor has linked tangible job benefits to the acceptance or rejection of sexual advances. It is enough to show that the supervisor used the employee's

acceptance or rejection of his advances as the basis for a decision affecting the compensation, terms, conditions, or privileges of the employee's job."); *Gostanian v. Bendel*, 96 Civ. 1781, 1997 WL 214966 at *6 (S.D.N.Y. April 25, 1997); *Corrigan v. Labrum & Doak*, 95 Civ. 6471, 1997 WL 76524 at *6 (S.D.N.Y. Feb. 21, 1997). "An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment [or quid pro quo harassment] created by a supervisor with immediate (or successively higher) authority over the employee." *Burlington Indus. v. Ellerth*, 524 U.S. 742, 118 S.Ct. at 2270; *accord, e.g., Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 2292–93, 141 L.Ed.2d 662 (1998).[10]

### 1. *There Was No Unwanted Sexual Conduct*

█ ACS argues that Adeniji's claim fails because he cannot prove that he was subjected to unwelcome sexual conduct. (ACS Br. at 11.) The Court agrees.

█ " 'Sexual conduct' encompasses sexual demands, sexual overtures, sexual harassment and prohibited conduct." *Gostanian v. Bendel*, 96 Civ. 1781, 1997 WL 214966 at *6 (S.D.N.Y. April 25, 1997); *see also, Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 65, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986); *Bridges v. Eastman Kodak Co.*, 822 F.Supp. 1020, 1027 n. 10 (S.D.N.Y.1993); EEOC Guidelines on Discrimination Because of Sex, 29 C.F.R. § 1604.11(a).

The Second Circuit recently reiterated that " '[w]hether particular conduct was . . . unwelcome presents difficult problems of proof.' " *Gallagher v. Delaney*, 139 F.3d at 346 (quoting *Meritor Sav. Bank v. Vinson*, 477 U.S. at 68, 106 S.Ct. at 2406). In *Gallagher*, the defendant supervisor showered plaintiff with gifts including "jewelry, a Vermont Teddy Bear, a single pink rose, and a book about angels." *Gallagher v. Delaney*, 139 F.3d at 344. He sent her cards with handwritten notes that read "Believe me, your [sic] the last person on Earth I want to see hurt." *Id.* He "complimented her on her physical appearance," and "asked her 'personal' questions," and "told her she brought out feelings in him that he had not had since he was sixteen." *Id.* In addition, he invited her to Atlantic City and told her to " 'keep [her] dance card free.' " *Id.* Faced with this evidence, the Second Circuit held that even though the request for sexual favors was not explicit, a jury could find it implicit in defendant's actions. As Judge Weinstein stated, "[a]n Article III judge is not a hierophant of social graces. Evaluation of ambiguous acts such as those revealed by the potential evidence in this case presents an issue for the jury." *Id.* at 347.

Here, unlike in *Gallagher*, no reasonable jury could find that Anderson implicitly solicited sexual favors. Anderson did not send any gifts or love letters to Adeniji; the most she did was send one Christmas

---

**10.** It is unclear whether both parties agree that Anderson was not Adeniji's direct supervisor. (Adeniji Rule 56.1 Stmt. ¶ 31; Ligorner Aff.Ex. A: Adeniji Dep. at 243.) Adeniji claims that Anderson assigned him cases and signed his leave of absence form on several occasions. (Adeniji Rule 56.1 Stmt. ¶ 31.) In effect, he claims that she was a de facto supervisor. As ACS does not address this issue, for purposes of this motion the Court accepts that Anderson acted as Adeniji's de facto supervisor. *See, e.g., DeWitt v. Lieberman*, 97 Civ. 4651, 1999 WL 13236 at *7 (S.D.N.Y. Jan. 13, 1999) (assuming for summary judgment purposes that plaintiff's alleged harasser was de facto supervisor);

*Thomas v. Medco*, 95 Civ. 8401, 1998 WL 542321 at *10–11 (S.D.N.Y. Aug. 26, 1998) ("a quid pro quo claim of harassment can rest on an alleged harasser's authority to influence an adverse employment decision, if that influence is so significant that the harasser may be deemed the de facto decision maker"); *Hernandez v. Jackson, Lewis, Schnitzler & Krupman*, 997 F.Supp. 412, 417 (S.D.N.Y.1998) (whether alleged harasser was plaintiff's de facto supervisor presented a triable issue); *Gostanian v. Bendel*, 1997 WL 214966 at *6 (worker who possesses the authority to affect the terms and conditions of plaintiff's employment is a de facto supervisor).

card addressed to "Ade & Family," and signed "Love! Eileen & Son Hoping that the New Year will be a blessed one." (Adeniji Aff.Ex. J.) She sent similar cards to all her subordinates. (Adeniji Aff.Ex. G: Anderson Dep. at 108–09.) If that constituted sexual harassment, Hallmark would be put out of business.

Adeniji testified that the only "sexual" comment Anderson ever made to him was: " 'You little thing. Why women run you all over.' " (Adeniji Aff.Ex. H: Adeniji Dep. at 286.) He did not state when this comment was made, and the Court therefore cannot tell if it was made during the time period (post-October 6, 1995) at issue in this suit. But even if not time barred, this one comment is clearly not sufficient to make out a sexual harassment claim. As the Supreme Court recently reiterated in *Oncale v. Sundowner Offshore Servs. Inc.*,

> Common sense, and an appropriate sensitivity to social context, will enable courts and juries to distinguish between simple teasing or roughhousing among members of the same [or opposite] sex, and conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive.

523 U.S. 75, 118 S.Ct. 998, 1003, 140 L.Ed.2d 201 (1998). Common sense dictates that Anderson's isolated comment was flirtatious at best, and no reasonable person in plaintiff's position would find it severely hostile or abusive. *See also, Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 2264, 141 L.Ed.2d 633 (1998); *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993) (" 'mere utterance of a ... [sexual] epithet which engenders offensive feelings in an employee ... does not sufficiently affect the conditions of employment to implicate Title VII' ").

Further, Adeniji did not show that after December 4, 1995, when he decided he did not want a sexual relationship with Anderson (Ligorner Aff.Ex. A: Adeniji Dep. at 265), Anderson explicitly or implic-

itly solicited a sexual relationship or conditioned his employment on the performance of sexual favors. In fact, the only specific "date" Adeniji recounts took place before he had a change of heart, on November 20, 1995; he claims they went to McDonalds for dinner, but she did not go home with him "because [he] wouldn't allow it." (Ligorner Aff.Ex. A: Adeniji Dep. at 261; Adeniji Br. at 14.) Adeniji alleges that Anderson talked to him about getting together after December 4, 1995 (Ligorner Aff.Ex. A: Adeniji Dep. at 265), however, he did not allege when, where or how this occurred or that Anderson ever explicitly, or implicitly, conditioned his job on his acceptance of her invitation. This is insufficient to prove unwanted sexual conduct. *See, e.g., Romero v. Caribbean Restaurants, Inc.,* 14 F.Supp.2d 185, 189 (D.P.R. 1998) (plaintiff's claim that supervisor "winked at him on a few occasions and made a lewd comment to plaintiff and another employee which plaintiff perceived as a sexual invitation" is insufficient to prove that sexual advances were unwelcome, since "[t]here is no evidence that [the superior] made any explicit or implicit requests or overtures to plaintiff for sexual favors" or "that [the supervisor] physically touched plaintiff in any way"); *Perez v. Interconnect Devices Inc.,* No. Civ.A. 97–2194, 1998 WL 781220 at *9 (D.Kan. Oct. 22, 1998) (no quid pro quo sexual harassment because "plaintiff failed to create a genuine issue of material fact whether [his supervisor] demanded sexual favors. Plaintiff's tenuous support for sexual favors consists of [his supervisor] smiling and talking closely to plaintiff's face, trying to make him jealous, and becoming angry when he spoke with female employees. Plaintiff also claims that [his supervisor] would take plaintiff out of his work area. These incidents clearly fall short of a demand for sexual favors.").

The Second Circuit has stated that "the employee's submission to the supervisor's advances is certainly relevant [and] bears ... on the issue of whether the sexual

advances were unwelcome." *Karibian v. Columbia Univ.,* 14 F.3d 773, 779 (2d Cir.), *cert. denied,* 512 U.S. 1213, 114 S.Ct. 2693, 129 L.Ed.2d 824 (1994). Adeniji stated that he and Anderson "were attracted to each other," went on one date (although she denies it), and that they remained friends after he changed his mind about having a sexual relationship with her. (Adeniji Rule 56.1 Stmt. ¶ 28; Ligorner Aff.Ex. A: Adeniji Dep. at 244; Adeniji Br. at 14–15.) Moreover, when Adeniji changed his mind about having a sexual relationship with Anderson, he never told her so. (Ligorner Aff.Ex. A: Adeniji Dep. at 266.) In fact, he stated that they remained "very close friend[s]" from July 1995 to March 1996. (Adeniji Rule 56.1 Stmt. ¶ 28; Ligorner Aff.Ex. A: Adeniji Dep. at 244.) Indeed, he testified that up until March 8, 1996 he had no idea that there was anything amiss in their relationship, and he "stay[ed] talking to Eileen all the time." (Ligorner Aff.Ex. A: Adeniji Dep. at 314; Adeniji Br. at 16.)

It is also striking that while Adeniji considered their amorous relationship over in December 1995, nonetheless, *he* sent *her* a Valentines card in February 1996. (Adeniji Br. at 18; Ligorner Aff.Ex. A: Adeniji Dep. at 310–11.) Adeniji's behavior toward Anderson further undermines his claim that her actions were unwelcome.

As the Supreme Court recently emphasized in *Oncale v. Sundowner Offshore Servs., Inc.:*

> The prohibition of harassment on the basis of sex requires neither asexuality nor androgyny in the workplace; it forbids only behavior so objectively offensive as to alter the "conditions" of the victim's employment. "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview." We have always regarded that requirement as crucial, and as sufficient *to ensure that courts and juries do not mistake ordinary socializing in the workplace—such as* male-on-male horseplay or *intersexual flirtation—for discriminatory 'conditions of employment.'*

We have emphasized, moreover, that the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering "all the circumstances."

523 U.S. 75, 118 S.Ct. at 1003 (citations omitted & emphasis added). Anderson's conduct here did not constitute sexual harassment.

### 2. *No Causal Connection*

 Not only did Adeniji fail to satisfy the first element (unwanted sexual conduct), but he failed to satisfy the second element (causal connection) as well. The only evidence Adeniji submitted on causation was the timing of events.

It is true that causation may be proved indirectly by showing that an adverse employment action followed closely in time after the employee rejected or complained about the supervisor's sexual advances. *See, e.g., Reed v. A.W. Lawrence & Co.,* 95 F.3d 1170, 1178 (2d Cir.1996); *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1308 (2d Cir. 1995); *Corrigan v. Labrum & Doak,* 95 Civ. 6471, 1997 WL 76524 at *7 (S.D.N.Y. Feb. 21, 1997).

Adeniji testified that he decided not to get sexually involved with Anderson on December 4, 1995. (Ligorner Aff.Ex. A: Adeniji Dep. at 265–66, 310–13.) He was not suspended until eleven months later, and was not fired until more than a year and four months after his supposed change of heart. (ACS Rule 56.1 Stmt. ¶¶ 31, 39; Ligorner Aff.Exs. R, Y.) The Court cannot infer causation here, where there is no temporal proximity between Adeniji's alleged rejection of Anderson and his suspension and termination. *See, e.g., Parkins v. Civil Constructors of Ill., Inc.,* 163 F.3d 1027, 1039 (7th Cir.1998) (no causal connection where there was a gap of less

than three months between plaintiff's last harassment complaint and her termination); *Sweeney v. West*, 149 F.3d 550, 557 (7th Cir.1998) (no causal connection where there was a gap of three years between plaintiff's filing an EEOC complaint and the adverse employment action); *Oliver v. Digital Equip. Corp.*, 846 F.2d 103, 110–11 (1st Cir.1988) (affirming trial court's dismissal of claim of retaliatory discharge where protected activity occurred over two years prior to the adverse employment action); *Holtz v. Marcus Theatres Corp.*, 31 F.Supp.2d 1139, 1147 (E.D.Wis.1999) ("[Plaintiff] cannot show a causal link between the end of her sexual relationship with [her supervisor] in 1993 and the manager decisions in 1996 because too much time lapsed and too many events intervened.... A three-year lapse between the end of her consensual sexual relationship with [her supervisor] in 1993 and [her manager's] decision regarding the hiring of managers in 1996 stretches the causal chain beyond the point of breaking."); *Sykes v. Mt. Sinai Med. Ctr.*, 937 F.Supp. 270, 276 n. 9 (S.D.N.Y.1996) ("the court finds as a matter of law no close proximity in time exists between the [protected acts "a year or two" earlier] and the discharge sufficient to establish a prima facie case of retaliatory discharge"); *Potenec v. Morgan Guar. Trust Co.*, 83 Civ. 4764, 1985 WL 2049 at *3 (S.D.N.Y. July 24, 1985) (a long lapse of time "between plaintiff's employment termination and the purported sexual advances raises serious questions about a causal nexus"); *compare e.g., Tomka v. Seiler*, 66 F.3d at 1308 (finding evidence to support an inference of discrimination where plaintiff's protected act occurred three months in one instance and three weeks in another, before the adverse employment action); *Corrigan v. Labrum & Doak*, 1997 WL 76524 at *7 (finding an inference of harassment where the supervisor began treating plaintiff in a hostile manner within days after she rejected his advances and "within less than three months she lost her job").

Moreover, ACS conducted two separate investigations into Adeniji's improper behavior, at which impartial hearing officers, whom Adeniji does not allege were biased or otherwise influenced by Anderson, determined that Adeniji's threatening and intimidating conduct warranted dismissal. (*See* ACS Rule 56.1 Stmt. ¶¶ 26, 30, 34, 37; Ligorner Aff.Exs. N, Q, U, X.) At neither of these hearings did Adeniji claim that Anderson sexually harassed him or filed charges in retaliation for Adeniji's refusal to comply with her sexual demands. The hearing officers' lack of awareness of any alleged personal relationship between Adeniji and Anderson, coupled with the fact that Anderson was not involved with either of the hearings that resulted in Adeniji's dismissal, further weakens, if not entirely disproves Adeniji's theory that Anderson caused his dismissal. *See, e.g., Llampallas v. Mini–Circuits, Lab., Inc.*, 163 F.3d 1236, 1249–51 (11th Cir.1998) (no causal connection between sexual harassment and adverse employment action where manager "did not know ... that [supervisor's] threat [to quit if plaintiff was not fired] was motivated by a discriminatory animus towards [plaintiff.] Thus, [manager] was not 'on notice' that [supervisor] could be scheming against [plaintiff] based on [plaintiff's] sex. [Plaintiff], although she had the opportunity to do so, failed to inform [manager] of her relationship with [supervisor] and of the information she possessed that would have put [manager] on notice that [supervisor's] threat may have been motivated by a discriminatory animus.")

Adeniji has not presented any evidence that Anderson, or ACS, disciplined or terminated him because of Anderson's alleged sexual interest in Adeniji. Indeed, Adeniji concedes that his only basis for concluding that there was a breakdown in their previously friendly relationship is that she filed disciplinary charges against him. (Adeniji Rule 56.1 Stmt. ¶ 28; Adeniji Br. at 16; Ligorner Aff.Ex. A: Adeniji Dep. at 170–71, 244, 314.) Adeniji has not shown causation.

### 3. No Evidence of Pretext

Even if Adeniji could have established a prima facie case of sexual discrimination, there is ample evidence that ACS fired Adeniji for legitimate, nondiscriminatory reasons. ACS suspended and then fired Adeniji only after many supervisors wrote him up at least nineteen times for improper, aggressive and threatening behavior, unprofessionalism and uncompleted assignments. (*See* Adeniji Aff.Ex. J; Ligorner Aff.Ex. C; ACS Rule 56.1 Stmt. ¶ 9.) This evidence establishes a legitimate, nondiscriminatory reason for Adeniji's discharge. *See, e.g., Hutcherson v. City of New York*, 95 Civ. 10074, 1998 WL 661490 at *3 (S.D.N.Y. Sept. 25, 1998) (defendant's evidence that supervisor received "numerous complaints from other employees regarding plaintiff's workplace demeanor" states a legitimate, nondiscriminatory reason for bringing plaintiff up on disciplinary charges and threatening her with termination); *Williams v. McCausland*, 90 Civ. 7563, 1995 WL 548862 at * 13 (S.D.N.Y. Sept. 15, 1995) (evidence that plaintiff "launched gratuitous, ad hominem personal attacks against [his supervisors] ... which other staff witnessed ... · clearly represents a legitimate, nondiscriminatory reason for his suspension and termination," citing cases); *Kramer–Navarro v. Bolger*, 586 F.Supp. 677, 682–83 (S.D.N.Y. 1984) (Weinfeld, D.J.) (firing plaintiff who swore at her co-workers, "disobeyed direct orders to report for work, violated [employer's] leave policy, and told the officer in charge of her facility to 'go to hell,' was an entirely valid, nondiscriminatory, and nonretaliatory business judgment").

 Since ACS articulated legitimate, non-discriminatory reasons for firing Adeniji, Adeniji must show that ACS's reasons for firing him were pretextual, and more likely than not sexual harassment resulting in gender discrimination was the true rea-son for firing him. *See* cases cited at page 421 above.

Adeniji has not attempted to produced any evidence that ACS's reason was pretextual. He has not offered any evidence that other employees who were written up countless times and threatened to shoot up the office were not terminated, or that Anderson got him fired because he refused her alleged advances. At most, Adeniji alleges that Anderson conspired with Stewart to write a false report about him—presumably the report in which Stewart states that Adeniji threatened to shoot up the office if Stewart did not sign his vacation request.[11] Yet this memo was only one of a number of memos written by three other supervisors who recounted incidents in which Adeniji was threatening and disruptive. Further, ACS held two hearings at which impartial hearing officers listened to Adeniji and his supervisors and found that Adeniji's "aggressive, volatile behavior is intimidating to both managers and co-workers alike. Mr. Adeniji's manner of speaking, acts as a catalyst to rile others (caseworkers) whose jobs are already stressful and seriously hampers the smooth functioning of the unit. For these reasons and the fact that Mr. Adeniji has a history of disciplinary problems, it is recommended that he be **Terminated**." (Ligorner Aff.Ex. U; *see also* Ligorner Aff.Ex. N.)

After an examination of the entire record, there is nothing to indicate that ACS's proffered reasons for firing Adeniji were a "pretext for discrimination." *See Fisher v. Vassar*, 114 F.3d 1332, 1339 (2d Cir.1997) (en banc). Accordingly, ACS should be granted summary judgment on Adeniji's quid pro quo sexual harassment claim. *See, e.g., Cerwinski v. Insurance Servs. Office, Inc.*, 112 F.3d 503 (table), No. 96–9368, 1997 WL 234672 at *2–3 (2d Cir. May 8, 1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 374, 139 L.Ed.2d 291 (1997);

---

**11.** While Adeniji states in one breath that Anderson conspired with Stewart to write a false disciplinary report about him (Adeniji Br. at 16), in the next breath Adeniji states that Anderson "never wrote a ... report on the plaintiff on her own initiative, but appears as if forced by Ms. Nunez." (Adeniji Br. at 15–16.)

*Christopher–Ketchum v. Agway Energy Prods.*, 988 F.Supp. 610, 616 (N.D.N.Y. 1997) (summary judgment for defendant where plaintiff's allegations of sex discrimination are "exceedingly weak, and plaintiff does not offer any direct evidence in support of her claim that [employer's] proffered reasons were merely pretext, nor does she offer any admissible circumstantial evidence of pretext"); *Taylor v. New York City Transit Auth.*, 96 Civ. 4322, 1997 WL 620843 at *6–7 (S.D.N.Y. Oct. 7, 1997) (Sotomayor, D.J.) (summary judgment for defendant where plaintiff "has not shown that [employer] could have taken any reasonable steps, other than to submit the issue to [an impartial panel] for a finding of credibility, in order to resolve the disputed facts between its employees"); *Ebbin v. Independent Television Network, Inc.*, 95 Civ. 10097, 1997 WL 441943 at*4–5 (S.D.N.Y. Aug. 5, 1997) (summary judgment for employer even though employer's stated reasons for firing plaintiff—there was "a personality conflict or antagonistic attitude"—could be pretextual, because plaintiff failed to show "some further allegation supporting an inference of discriminatory motivation for her dismissal . . . apart from [employers'] alleged vacillation regarding the grounds for her dismissal"); *Agugliaro v. Brooks Bros., Inc.*, 927 F.Supp. 741, 746–48 (S.D.N.Y. 1996) (summary judgment for employer where "a reasonable jury could only conclude that plaintiff did sexually harass a 24–year old female stock clerk who was subordinate," and "even assuming the plaintiff . . . presented sufficient evidence to raise an issue of fact as to whether he actually sexually harassed [the stock clerk] . . . plaintiff has presented no evidence to rebut defendants' sworn statements to the effect that they found [the stock clerk] to be credible, believed that plaintiff had sexually harassed her, and fired him because of that belief.").

## B. *Hostile Work Environment Harassment*

■ The failure of Adeniji's quid pro quo harassment claim does not end the Court's inquiry. In *Burlington v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 2265, 141 L.Ed.2d 633 (1998), the Supreme Court warned courts to be careful not to pigeonhole sexual harassment claims into mutually exclusive quid pro quo or hostile work environment categories. Thus, if a plaintiff fails to establish that detrimental employment action resulted from his refusal to submit to a supervisor's sexual overtures and involves only unfulfilled threats, the claim "should be categorized as a hostile work environment claim which requires a showing of severe or pervasive conduct." *Id.*

■ Here, Adeniji has failed to make out a hostile work environment claim. The Supreme Court recently set forth the standards for a hostile work environment claim in *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998):

> In order to be actionable under the statute, a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so. We directed courts to determine whether an environment is sufficiently hostile or abusive by "looking at all the circumstances," including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Most recently, we explained that Title VII does not prohibit "genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex." A recurring point in these opinions is that "simple teasing," offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the "terms and conditions of employment."

These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a "general civility code." Properly applied, they will filter out complaints attacking "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." ... We have made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment....

*Id.* 524 U.S. 775, 118 S.Ct. at 2283–84 (citations omitted).

Adeniji's evidence of sexual harassment amounts to one flirtatious comment, a greeting card signed "love," and Anderson's alleged suggestion that she and Adeniji go out some time. The Second Circuit and district courts within this circuit have routinely rejected hostile work environment sexual claims alleging far more offensive incidents. *See, e.g., Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 768 (2d Cir.1998) ("Though the two incidents in question—[supervisor's] comment, apparently regarding [plaintiff's] posterior, and his use of papers held in his hand to touch her breasts—are obviously offensive and inappropriate, they are sufficiently isolated and discrete that a trier of fact could not reasonably conclude that they pervaded [plaintiff's] work environment. Nor are these incidents, together or separately, of sufficient severity to alter the conditions of [plaintiff's] employment without regard to frequency or regularity."); *Hall v. South Cent. Conn. Reg'l Water Auth.,* 28 F.Supp.2d 76, 80, 86–87 (D.Conn.1998) (one supervisor asking plaintiff about her menstrual period, calling her a "bimbo" and "stupid woman," and another supervisor telling plaintiff that he found his wife in bed with a black woman, is insufficient "to support a finding that [plaintiff] was subjected to abuse of sufficient severity or pervasiveness so as to alter the conditions of her employment"); *Nolan v. Epifanio,* 96 Civ. 2562, 1998 WL 665131 at *3–4 (S.D.N.Y. Sept. 28, 1998) (supervisor over the course of seven years telling plaintiff that "if she couldn't do her 'fucking job' the company should hire a man that could and that she should stay home where she belonged" and "while holding open a door through which plaintiff was walking, pulled down his fly and pulled out what appears to be the tail of his shirt, allegedly while saying 'the only time I smile is when I use this' " "do[es] not remotely make out a case of hostile work environment form any reasonable viewpoint"); *Phillips v. Merchants Ins. Corp.,* 3 F.Supp.2d 204, 206, 208 (N.D.N.Y.1998) (supervisor's commenting that "she did not care whether [plaintiff] had to 'dance naked in the snow' to get business," asking plaintiff "if he thought he was a 'big man on campus' "; "direct[ing] profanity at him," and "call[ing] him 'names such as "little boy," "tough son-of-a-bitch," and "dumb man' " ... although offensive, when examined in context appear far more hostile and angry than sexual. Behavior that is immature, nasty, or annoying, without more, is not actionable as sexual harassment.).

Adeniji's comparatively harmless allegations clearly do not amount to a severe and pervasive hostile work environment.

ACS's summary judgment motion on Adeniji's sexual harassment claim should be granted.

## VII. *ADENIJI'S IFP STATUS*

Adeniji was granted in forma pauperis ("IFP") status based upon a July 14, 1997 declaration stating that he was on public assistance. (Ligorner Reply Aff.Ex. F: Adeniji IFP Aff.) ACS claims that Adeniji's IFP status should be revoked and the case dismissed, because Adeniji purchased at least seven deposition transcripts costing between $1,268.72 and $1,474.10. (ACS Reply Br. at 8–10.) Adeniji did not respond to ACS's reply brief.

The Court, however, need not now address this issue as this Report and Recommendation moots ACS's request that the case be dismissed for Adeniji's alleged IFP violation. If ACS continues to pursue its

request to have Adeniji's IFP status withdrawn or require him to pay the filing costs of this action, ACS can bring the issue to Judge Wood's attention by objecting to this portion of my Report & Recommendation, and Adeniji will have the opportunity to respond. The Court cannot fathom, however, why ACS would pursue this issue any further at this stage of the litigation.

## CONCLUSION

This is another case where Judge Rakoff's observation is apt: "plaintiff's resort to alleging every kind of discrimination for which he could possibly qualify ... suggests the poverty of his position." *Cooper v. New York State Dep't of Human Rights*, 986 F.Supp. 825, 829 (S.D.N.Y.1997).

For the reasons set forth above, the Court recommends that ACS's summary judgment motion be granted in its entirety and Adeniji's action be dismissed.

## FILING OF OBJECTIONS TO THIS REPORT AND RECOMMEN-DATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from receipt of this Report to file written objections. *See also* Fed.R.Civ.P. 6. Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Kimba M. Wood, 500 Pearl Street, Room 1610, and to the chambers of the undersigned, 500 Pearl Street, Room 1370. Any requests for an extension of time for filing objections must be directed to Judge Wood. Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *IUE AFL—CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir.1993), *cert. denied*, 513 U.S. 822, 115 S.Ct. 86, 130 L.Ed.2d 38 (1994); *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir.1993); *Frank v. John-son*, 968 F.2d 298, 300 (2d Cir.), *cert. denied*, 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696 (1992); *Small v. Secretary of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir.1989); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 57–59 (2d Cir.1988); *McCarthy v. Manson*, 714 F.2d 234, 237–38 (2d Cir.1983); 28 U.S.C. § 636(b)(1); Fed. R.Civ.P. 72, 6(a), 6(e).

March 8, 1999.